## MERRELLI v. CITY OF ST. CLAIR SHORES.

1. MUNICIPAL CORPORATIONS—TAXATION—EXPENSES.

    A city has ample authority to raise from its citizens by taxation all sums necessary to defray the expenses of its municipal operations (CLS 1956, § 117.3).

2. LICENSES—POLICE POWER—FEES.

    A regulation under the police power for the protection of the public peace, health and safety will not be held as invalid as a revenue-raising measure, where the revenue to be derived therefrom is not disproportionate to the cost of issuing the license and the regulation of the business to which it applies.

3. SAME—POLICE POWER—PRESUMPTIONS.

    It will be presumed that the amount of a fee for a license issued pursuant to the police power for the protection of the public peace, health and safety, is reasonable unless the contrary appears upon the face of the law itself or is established by proper evidence.

4. SAME—POLICE POWER—FEES—EXPENSES.

    The determination as to whether or not a fee for a license, issuable under the police power for the protection of the public peace, health and safety, is excessive, involves a consideration as to the absence or amount and the nature of the subject of regulation and if the amount of the fee is wholly out of proportion to the expense involved, it will be declared a tax and invalid.

REFERENCES FOR POINTS IN HEADNOTES

[1] 38 Am Jur, Municipal Corporations § 382.
[2] 33 Am Jur, Licenses § 19.
[3, 4] 33 Am Jur, Licenses § 46.
[5] 33 Am Jur, Licenses §§ 44, 46.
[7] 51 Am Jur, Taxation § 325.
[8] 3 Am Jur, Appeal and Error § 1211.

5. SAME—BUILDING PERMIT FEES—EXPENSES.

Fees charged under series of amendatory ordinances for various types of building permits for electrical, plumbing and other work normally performed in the construction of buildings were invalid, where they produced revenue that far exceeded the total direct and indirect costs attributable thereto (City of St. Clair Shores Building Ordinance).

6. MUNICIPAL CORPORATIONS — COST OF GOVERNMENT — REIMBURSEMENT FOR REGULATION OF NEW BUILDING.

A city may not defray the general cost of government under the guise of reimbursement for the special services required by the regulation and control of new buildings.

7. CONSTITUTIONAL LAW—POLICE POWER—REVENUES.

The police power may not be used as a subterfuge to enact and enforce what is in reality a revenue-raising ordinance.

8. APPEAL AND ERROR—REMAND—DECLARATION OF RIGHTS—MANDAMUS—BUILDING PERMIT FEES.

Suit for declaration of rights under city ordinance relative to building permit fees and consolidated mandamus proceeding to compel issuance of permits under previous ordinance are remanded for further proceedings so as to enable city to present additional testimony involving charges differing from those presented for determination as to justification of increase of fees charged under amended ordinance (City of St. Clair Shores Building Ordinance).

Appeal from Macomb; Kane (Edward T.), J., presiding. Submitted October 15, 1958. (Docket Nos. 59, 60, Calendar Nos. 47,626, 47,488.) Decided April 13, 1959.

Bill by Fred Merrelli against the City of St. Clair Shores, a municipal corporation, for declaratory judgment challenging validity of fees charged for building permits. Mandamus involving same parties and joining Donald J. Harms, city clerk, to enforce issuance of building permits upon payment of fees computed under a previously existing schedule. Cases consolidated for trial and appeal. Bill and petition dismissed. Plaintiff appeals. Reversed and remanded.

*Moll, Desenberg, Purdy & Glover,* for plaintiff.

*John H. Yoe,* for defendants.

Smith, J. This case involves the validity of fees charged by the city of St. Clair Shores for what we will refer to generally as "building permits." Included are permits for electrical, plumbing, and other work normally performed in the construction of buildings.

The city before us had adopted a series of ordinances entitled, "An ordinance to amend ordinance regulating the erection, construction, alteration, repair, moving, demolition, occupancy, change of occupancy, equipment, height, area, location and maintenance of buildings and structures, including all appurtenances therein, in the city of St. Clair Shores." Representative portions are as follows:

"Sec. 118.o—Fees. No permit to begin work for new construction * * * shall be issued until the fees prescribed in this section have been paid."

"Sec. 4. The plumbing code of the city of Detroit, Michigan * * * is adopted by reference and made a part of this ordinance * * * except that the fees as provided therein shall in lieu thereof be as follows:" (Here follow specific fees, each manhole, water closet, sink, et cetera, *e.g.,* "Each manhole $1.25," "Each water closet, first one at $2.50—each additional at $1.00 ea.")

"Sec. 5. The national electrical code * * * is adopted by reference * * * except that the fees as provided therein shall be as follows:" (Here, again, follows a list of specific fees for wiring, signs, fixtures, et cetera.)

The authority of the city, under its charter, to require the payment of fees in connection with such

regulation is not at issue,[1] nor is the validity of the fees that were charged prior to September 20, 1954.

The plaintiff[2] is the land contract vendee of certain premises in the city of St. Clair Shores. He applied for building permits, and tendered the fees imposed "by the valid provisions of such ordinances" (*i.e.*, those fees in effect prior to the increase made and here complained of) but was refused upon the ground that the fees imposed by amendments to the ordinances were those required to be paid. Plaintiff, asserting that such increased fees were invalid and ineffective (for reasons hereinafter stated in more detail), sought judicial relief against the city and its clerk as above noted. Motion to dismiss was made and granted at the end of plaintiff's case.

It may somewhat assist our analysis of the issues presented if we have before us the essence of the positions of plaintiff and defendants. The problem is not peculiar to this State, as the geographical breadth of the applicable authorities demonstrates, and is a part of the mass of problems in the field of municipal finance caused by the exodus to the suburbs.[3] The solution of the fiscal problems resulting is what Fordham's comprehensive analysis[4] describes (p 442) as "a complex patchwork," embracing "a conglomeration of ad valorem property taxes, special taxes, special assessments, capitation taxes, various excises such as license and retail sale taxes,

[1] See CLS 1956, § 117.3 (Stat Ann 1957 Cum Supp § 5.2073); St. Clair Shores, Mich., Charter (1955), §§ 3(c)–3(e) (original §§ 2.3–2.5).

[2] Two proceedings were brought and are before us, consolidated for trial at the circuit and consolidated upon appeal: A bill of complaint for declaratory judgment and a petition for writ of mandamus. Each challenges the validity of amendments increasing permit fees under the building code and related ordinances.

[3] *E.g.*, *Kelber* v. *City of Upland*, 155 Cal App2d 631 (318 P2d 561) (school fund); *Lawrence* v. *City of Concord*, 156 Cal App2d 531 (320 P2d 215) (drainage).

[4] See Fordham, Local Government Law (1949), with special reference to chapter 6, "Finance."

service charges, income from enterprises, Federal and State grants in aid, allocations of Federal and State tax revenues, fines and penalties and even severance and income taxes."

In the case before us, counsel for the defendant city summarizes the nature of the local problem, and its attempted solution, in the following terms in his argument upon the motion to dismiss:

"The facts I believe established that St. Clair Shores as a municipality had some 19,000 people in 1950, and now admittedly, somewhere between 50,000 and 60,000 people, so that within the 5-year period, the population has tripled. Exhibit 2 shows the charges that were made and the items which are included in the establishing of the building permit fees. Essentially, we have a party not necessarily a resident of St. Clair Shores, applying for a building permit, and as such, purchasing such special services. In other words, in applying the tripling of the population within the 5-year period, if the residents of St. Clair Shores had their residences there before 1950, or at any time prior to this rapid increase in population, that it would be unfair and inequitable to expect the local residents to bear the cost of special services to be rendered to persons applying for building permits and constructing homes."

Plaintiff's rejoinder illuminates the issue we will explore:

"The situation is very simply revealed and it comes down to a very simple question; does the city of St. Clair Shores have the right to assess a special charge against the purchaser of a new home collected from him by indirectly adding to his building cost for providing police protection, fire protection, the taking care of the streets?"

The city, then, faced with fiscal problems deriving from an unprecedented expansion of its population, and the demand for increased municipal services re-

sulting therefrom, sought a partial solution in an increase of the fees relating to building permits. Consequently, as expressed in the testimony of Mr. Finney, the fiscal expert retained by the city, the amount of the building permits and other fees was re-examined:

"*Q.* What was done by you with relation to building permits and other fees that are included in exhibit—

"*A.* Well, we went over the records, 1953 and 1954, at that time 1955 was not available because of the time limit. We had various conferences with officials and took those items which we considered might have something to do with building activities in order to arrive at a guestimate [estimate] with reference to what the fees should properly be. We did not go into detail at that time into the cost of the situation; it was only after the first case here that we were in court and it came to our attention that the judge would like to have those costs, that we proceeded to go into it more in detail in order to present those costs in what we considered was a fair and reasonable manner. By doing that, we held several conferences with the various—again held several conferences and went over the records more thoroughly. We went into the individuals who had something to do with the building activities, as to what time they spent in conferences, and Mr. Stauder, the comptroller and I and these different men met to determine what would be the fair amount. Those items that we considered were inapplicable to the builders' fees we deleted entirely from the cost. Those that we felt might have something to do with the overhead and burden that was borne by the different departments because of the building activities, we spread over the building activities on a relationship ratio of the expense or overhead burden to the salaries involved in that particular department. Those departments that had nothing to do with the building activities stood their share on a salary ratio

basis of the overhead or straight burden. We tried to apply these expenses equitably."

Accordingly, the various officials of the city government surveyed the activities of their offices and departments and estimated roughly the percentage of their governmental activities that might be allocated to "building operations." Thus, the police chief took into account the protection of the builder's property against vandalism, complaints about children playing in the new homes, and traffic violations (both as to speed and parking regulations) by workmen and builders' trucks. Through such things, it was felt, "the builders in their building activities caused this additional expense to their police department." The city treasurer estimated that she spent 10% of her time directly on activities of building operations, though what she did besides depositing the fees for the various building permits, does not appear. No estimates, incidentally, of the part of her time chargeable to other departments was made. The "building activities" also gave the sanitation and streets divisions of the department of public works extra trouble, since, it was surmised, probably with much justification, the builders' trade subjected the roads to a substantial hard usage, though it was frankly admitted that no accounting procedure employed purported to segregate such usage or wear and tear attributable thereto. The fire department, also, was subjected to additional burdens. Among other tasks it was required to make certain fire runs because of new construction, it appearing that "there were 29 alarms of fire which the St. Clair Shores fire department responded to as a direct result of the new building program in the city of St. Clair Shores."

As a result of such surveys, studies and allocations of time and activities, the following conclusions were reached with respect to the new building activities:

· "The resultant total direct costs from exhibit 5 and exhibit 3 reflected in the budget year 1954 (1953)–1955(1954), $61,504.91 as engineering costs; $127,212.31 as D.P.W. street costs; $8,255.77 D.P.W. sanitation costs; $32,742.74 administrative costs; $39,838.55 police department costs and $21,863 fire department costs for a total cost directly applicable to the building program as $291,417.28.

"The direct costs for budget year 1954–1955 in the same order was $79,053.84 engineering; $136,502.17 D.P.W. streets; $11,038.32 D.P.W. sanitation; $48,-088.11 administrative; $50,216.58 police; $19,777.63 fire costs for a total of $344,676.65."

Certain legal principles in municipal administration should be kept clearly before us in the consideration of the problem presented. In the first place, there is no doubt that the city of St. Clair Shores had ample authority to raise from its citizens by taxation all sums necessary to defray the expenses of its municipal operations. Section 8.9 of its charter provided as follows:

"The council shall raise annually by a general tax upon the real and personal property liable to taxation in the city, such sums of money as it shall deem necessary to defray the expenses and pay the liabilities of the city and to carry into effect the powers in this charter granted; provided, that the council shall not have authority to levy taxes in any 1 year in an amount exceeding 1–1/2% of the assessed valuation of such property."

To be contrasted with the revenue derived from municipal taxation are those moneys accruing from the issuance of licenses or permits coming under the police power of the community. These are regulatory measures involving the public health, morals, or welfare. Thus, in the area before us (the building codes) electrical circuits must conform to stated standards in order that the threat of fire, or personal

injury, be minimized. Plumbing installations must conform to standards imposed in the interest of the public health. The closing language of the plumbing and electrical ordinances quoted above show a complete recognition of the function and purpose of the ordinance:

"The provisions of the ordinance are hereby declared to be immediately necessary for the preservation of the public peace, health, and safety."

In short, we have considered 2 sources of municipal funds, differing in governmental theory, each having inherent limitations resulting therefrom. One involves an exercise of the municipal power of taxation. Its purpose is to raise money. The other is an exercise of the police power of the community. Its purpose is the protection of the public health, safety, and welfare. True, certain moneys may be obtained in connection therewith, but such moneys are incidental to the accomplishment of the primary purpose of guarding the public. The differences between the 2 were well expressed in *Vernor* v. *Secretary of State,* 179 Mich 157, 167–170 (Ann Cas 1915D, 128), involving the validity of an automobile licensing fee:

"To be sustained, the act we are here considering must be held to be one for regulation only, and not as a means primarily of producing revenue. Such a measure will be upheld by the courts when plainly intended as a police regulation, and the revenue derived therefrom is not disproportionate to the cost of issuing the license, and the regulation of the business to which it applies. (Citing cases.)

"Anything in excess of an amount which will defray such necessary expense cannot be imposed under the police power, because it then becomes a revenue measure. (Citing cases.)

"It is true that it has been held that what is a reasonable fee must depend largely upon the sound dis-

cretion of the legislature, having reference to all the circumstances and necessities of the case. It will be presumed that the amount of the fee is reasonable, unless the contrary appears upon the face of the law itself, or is established by proper evidence. (Citing cases.)

"In determining whether a fee required for a license is excessive or not, the absence or amount of regulatory provisions and the nature of the subject of regulation should be considered, and, if the amount is wholly out of proportion to the expense involved, it will be declared a tax. * * *

"The act we are considering provides for no policing or police regulation. The expense of operating the department, including the furnishing of the lists of owners to the county clerks, will be so inconsiderable, compared with the amount collected, that we must take judicial notice that the great amount of surplus (probably more than half a million dollars) renders the imposition of the license fee or tax so wholly and palpably unreasonable as to invalidate the law as a license measure, and to stamp upon it the intention of imposing a tax instead of a license. The clear purpose of the legislature in exacting so large an amount from the owners of automobiles was to produce a fund for highway purposes under the guise of regulation, which makes it a tax measure which clearly is not covered by the title of the act. The obvious purpose of the amendment in the act of 1913, increasing the fees according to horsepower, was to increase that fund. There can be no more labor or expense in registering a vehicle of high horsepower than in registering one of low power, and the only reasonable purpose in the graduated fee is the increased revenue. This graduated fee according to horsepower must be held to be a mere guise or subterfuge to obtain the increased revenue."

See, also, *Fletcher Oil Co.* v. *City of Bay City,* 247 Mich 572.

With these principles in mind we turn to the charges resulting from the fee increases established by the amendatory ordinances. We need not trace in detail the voluminous cost analyses submitted (and challenged) by the experts. The ultimate results thereof are clear. The total fees from building permits increased from $180,223 for the fiscal year ending June 30, 1954 (before the amendments here under consideration), to $514,109 for the fiscal year ending June 30, 1955. No corresponding increase in the expense of regulation is shown. For the latter fiscal year the general taxes net was only slightly greater, namely, $554,856. During the same period the total expenditure of the entire engineering department (of which the building division, administering the building code, was only a part) was $98,642, of which the costs allocated to the building division were $69,727-.45. During this year there were 5 inspectors (whose salaries totalled $26,826.06) employed in administering and enforcing the building code. In addition 2 or 3 of the clerks in the engineering department were assigned to the building division and they, with the inspectors, did the bulk of the work of checking over plans, issuing permits, and inspection of work under the permits. It is clear from the testimony adduced, paraphrasing the words of the *Vernor Case, supra,* that the revenue derived from the licenses is entirely disproportionate to the cost of issuing the license and the direct and indirect costs of the administration thereof. If we are to assume that the municipality's costs for such licensing merely defray its necessary expenses incurred in connection therewith we must conclude that such costs exceed 30% of the total general fund revenue of the city, a conclusion completely at variance with the testimony adduced.

What has actually happened here is that the city has sought to charge (as "costs" incurred in administering and enforcing the building code) a substantial

part of the increased expenses of city government arising from the growth of the city. It is true that without compliance with the building code there would be no increase in housing in the community, without housing no influx of newcomers, and without newcomers no necessity for vastly increased governmental services of all kinds. But it was not the administration and enforcement of the codes relating to building construction that caused the increase in necessary and expensive governmental services. It was the increased population. The burden of additional revenue must, of course, be carried, for fire, and police, and sanitation, but it cannot be loaded onto the administration and enforcement of the building code, any more than could the increased costs for schools occasioned by those who live in the houses erected in compliance with the code. These are the public problems of the community and the expenses incurred in their solution are to be defrayed (absent valid legislation otherwise providing) from the general revenues of the city, not on a fee basis under the guise of regulating such matters as plumbing and wiring in the new houses.

The situation before us received careful examination recently by the supreme court of New Jersey in *Daniels* v. *Borough of Point Pleasant* (1957), 23 NJ 357, 360, 362 (129 A2d 265). The facts sufficiently appear in the excerpt quoted:

"The borough urges that since it has the power to regulate and control building within the municipality it has the power to fix and charge fees incident to that regulation to defray the costs of controlling the building. It also urges that it has not only the right to charge fees incident to the actual regulation of the building but also to include in these fees an amount to defray the costs of government resulting from the building of the new buildings. It urges that the amended ordinance is clearly a regulatory

measure and that the fees are charged only as an incident to regulation, and as such are not unlawful, unless they are unfair, unreasonable or confiscatory. This, they say, the plaintiff has been unable to prove to a sufficient extent to overcome the presumption of validity that attaches to an ordinance of a municipal body.    *   *   *

"What the Borough of Point Pleasant is attempting to do here is to defray the general cost of government under the guise of reimbursement for the special services required by the regulation and control of new buildings.

"Here, the difference between the cost to the borough of regulating and controlling new construction bears no reasonable relation to the amount of revenue raised by the new amendatory ordinance. The record indicates that approximately the same services will now be rendered as were rendered in the prior years by the building inspector, and that the fees raised by the new ordinance exceed by more than 700% the cost of inspecting the buildings and regulating the construction. Admittedly, the purpose of the ordinance was to raise revenue to defray the increased cost of school and other government services. The philosophy of this ordinance is that the tax rate of the borough should remain the same and the new people coming into the municipality should bear the burden of the increased costs of their presence. This is so totally contrary to tax philosophy as to require it to be stricken down; see *Gilbert v. Town of Irvington* (1956), 20 NJ 432 (120 A2d 114). Admittedly, these fiscal problems confronting many of our rapidly growing municipalities are grave ones and would seem to call for legislative action; the remedy must come not from the municipalities nor from the courts but from the legislature."

In the case before us, also, it is clear that the revenue derived from the licenses is entirely disproportionate to the costs of issuance thereof, and of the proper regulation of construction.

The police power may not be used as a subterfuge to enact and enforce what is in reality a revenue-raising ordinance. Cooley, Taxation (4th ed), § 1680. Here the testimony of the various city officials in support of the schedule of amended fees makes it clear that what was sought to be defrayed was, in the words of Chief Justice Vanderbilt, "the general cost of government under the guise of reimbursement for the special services required by the regulation and control of new buildings." At this point lies the fatal defect in the defendant's course of action. We would not, of course, be construed as holding that only the direct costs (*e.g.,* the salaries of inspectors) are chargeable to the new construction. The indirect costs, as well, of administering and enforcing the police regulation are recoverable, but they must in fact be such indirect costs, as distinguished from the costs of expanded government services, and they must be established by reasonably accurate accounting procedures and not, as is sometimes the case in the figures before us, by mere "guestimate" (the word is that of a witness) unsupported by other than speculation. The law does not demand a precise correlation between costs and fees required, but, rather, a reasonable relation. Such, however, is not found here. The cases involving the licensing and surveillance of enterprises such as are liable to promote public disorder, or nuisance, or crime, are not inconsistent herewith. *Higgins* v. *Lacroix,* 119 Minn 145 (137 NW 417, 41 LRA NS 737); *People* v. *Riksen,* 284 Mich 284 (116 ALR 116).

The disposition of the case has given us some difficulty. The dismissal of plaintiff's case was at the end of his proofs only, yet plaintiff had called for cross-examination the city's fiscal experts and other officials who, presumably, had offered to the court whatever justification was available for the increased fees. Upon the theory that the city may, however,

have additional testimony to present involving charges of a different nature than those now before us, we are remanding both cases for further proceedings not inconsistent herewith.

Reversed and remanded.   Costs to appellant.

DETHMERS, C. J., and CARR, KELLY, BLACK, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred.