WOLF v CITY OF DETROIT

Docket No. 279853. Argued February 5, 2009, at Lansing. Decided
January 21, 2010, at 9:00 a.m.

Laurence G. Wolf, doing business as Lawrence Wolf Properties,
brought an original action in the Court of Appeals against the city
of Detroit, seeking a declaration that the solid waste inspection fee
charged by the city to the owners of commercial and industrial
properties who do not contract with the city for solid waste
removal services constitutes a tax that violates Const 1963, art 9,
§ 31 of the Headlee Amendment, because it was imposed without
a vote of the city's electorate. The city responded, contending that
the inspection charge is a valid regulatory fee that has the purpose
of making sure that the owners of commercial and industrial
properties make arrangements for trash disposal service at a level
appropriate to handle the solid waste generated on the properties.
Plaintiff moved for summary disposition.

The Court of Appeals *held*:

1. A "tax" is designed to raise revenue, while, in general, a
"fee" is exchanged for a service rendered or a benefit conferred and
some reasonable relationship exists between the amount of the fee
and the value of the service or benefit.

2. The three criteria for a "fee" are that a fee serves a
regulatory purpose, is proportionate to the necessary costs of the
service, and is voluntary. The three criteria are not to be consid-
ered in isolation, but are to be considered in their totality, so that
a weakness in one area does not necessarily mandate a finding that
the charge at issue is not a fee. Additional considerations when
evaluating these three criteria for a fee include: whether the
charge constitutes an investment in infrastructure; whether the
charge simply defrays the cost of a regulatory activity; whether the
charge reflects the actual cost of use, metered with relative
precision in accordance with available technology, including some
capital investment component; whether the charge corresponds to
the benefits conferred; whether the charge applies only to those
property owners who will enjoy the full benefits of the new
construction or applies to all property owners; whether the ordi-
nance imposing the charge lacks a significant element of regula-
tion; whether the payment of the charge is compulsory only for

those who use the service; whether the users of the service have the ability to choose how much of the service to use or whether to use the service at all; whether the charge raises revenue to replace a portion of a program that was previously funded by a government's general fund; whether the charge may be secured by the imposition of a lien; and whether the charge is billed through a governmental unit's assessor's office and is mailed with property tax statements.

3. The solid waste inspection fee satisfies the first criterion because it serves the regulatory purposes of enabling the city to inspect commercial and industrial properties to make sure that they have made arrangements for trash disposal service, whether it is a private contractor or the city, as well as to ensure that each business has an appropriate level of solid waste collection service. The fee satisfies the regulatory purposes of ensuring the efficient removal of solid waste products and protecting the public by reducing blight and illegal dumping.

4. The manner in which the city implements the inspection process supports the conclusion that the fee serves a regulatory purpose. The continuing reduction of the amount of the fee charged as the city refines the inspection process contradicts the notion that the city imposed the fee solely for the purpose of enhancing the city's revenue stream.

5. The inference that may be drawn from the city's failure to complete each inspection required in the 2007-2008 fiscal year, that the city launched the inspection program before it had worked out the details of the process, does not support a conclusion that the city intended the fee solely to generate revenue.

6. The fact that the fee generates revenue for the city's Department of Public Works does not establish that it is a tax. A regulatory fee can have dual purposes and still maintain its regulatory character. As long as the primary purpose of a fee is regulatory in nature, the fee can also raise money provided that it is in support of the underlying regulatory purpose. The solid waste inspection fee generates revenue in support of an underlying regulatory purpose.

7. The Court of Appeals must presume that the amount of the fee is reasonable, unless the contrary appears on the face of the law itself or is established by proper evidence. The evidence shows that any disproportionality in the fees charged by the city to the services provided resulted from the city's lack of preparedness to implement the inspection process, not an intent by the city to generate a revenue stream outside its taxing power by subterfuge.

8. The evidence establishes that the fee is voluntary and this suggests that the fee is not a disguised tax.

9. The mere facts that the city bills the fee on the property owner's tax bill and may place a lien on the property owner's parcel in the amount of the fee do not transform an otherwise proper fee into a tax.

10. Plaintiff's motion for summary disposition must be denied and summary disposition must be granted in favor of defendant.

Summary disposition granted in favor of defendant.

1. TAXATION — WORDS AND PHRASES — TAXES — FEES.

A "tax" is designed to raise revenue, while a "fee" generally is exchanged for a service rendered or a benefit conferred and some reasonable relationship exists between the amount of the fee and the value of the service or benefit.

2. TAXATION — FEES — PRIMARY CRITERIA.

The three primary criteria to be considered when distinguishing between a fee and a tax is that a fee serves a regulatory purpose rather than a revenue-raising purpose, a fee is proportionate to the necessary costs of the service rendered or benefit conferred in exchange for the fee, and a fee is voluntary; the criteria are to be considered in their totality, not in isolation, so that a weakness in one area does not necessarily mandate a finding that the charge at issue is not a fee.

3. TAXATION — FEES — REGULATORY FEES.

A regulatory fee can have dual purposes and still maintain its regulatory character; as long as the primary purpose of the fee is regulatory in nature, it can also raise money if it is in support of the regulatory purpose.

*Kickham Hanley PLLC* (by *Gregory D. Hanley* and *Timothy O. McMahon*) for plaintiff.

*Krystal A. Crittenton*, Corporation Counsel, and *James Noseda* and *Joanne D. Stafford* for the city of Detroit.

Before: WHITBECK, P.J., and BORRELLO and SERVITTO, JJ.

PER CURIAM. In this original action,[1] plaintiff, Laurence G. Wolf, doing business as Laurence Wolf Properties (Wolf), seeks a declaration that a new solid waste inspection fee charged by the city of Detroit to the owners of certain commercial and industrial properties constitutes a disguised tax. Wolf asserts that if the new solid waste inspection fee is a disguised tax, then it violates § 31[2] of the Michigan Constitution's Headlee Amendment[3] because the city imposed the tax without a vote of its electorate. Applying the criteria that the Michigan Supreme Court established in *Bolt v City of Lansing*,[4] we conclude that the inspection charge is a valid regulatory fee, not a disguised tax.

### I. BASIC FACTS AND PROCEDURAL HISTORY

#### A. THE CREATION AND IMPLEMENTATION OF THE NEW SOLID WASTE INSPECTION FEE

Chapter 22 of the Detroit City Code governs all aspects of the handling of solid waste generated at all residential and commercial property within the city, as well as blight prevention. Its provisions, as stated in § 22-2-1, are intended to provide "a sanitary and satisfactory method of storage, preparation, collection, transport, disposal and placement of municipal solid waste, and for the maintenance of public and private property in a clean, orderly, and sanitary condition to ensure the peace, health, safety, and welfare of the People of the City of Detroit." The code prohibits "any person" other than the employees of the city's Department of Public Works or private waste collectors li-

---

[1] See MCL 600.308a.

[2] Const 1963, art 9, § 31.

[3] Const 1963, art 9, §§ 25-34.

[4] *Bolt v City of Lansing*, 459 Mich 152, 154, 158-159; 587 NW2d 264 (1998).

censed by the city from removing solid waste from private and commercial properties within the city. Although the code charges the Department of Public Works with the overall responsibility for solid waste collection and disposal within the city, a reorganization plan that the Detroit City Council approved in 2002 reassigns the inspectors responsible for enforcing the provisions of Chapter 22 of the Detroit City Code from the Department of Public Works to the city's Department of Environmental Affairs. Thus, the Department of Public Works is to verify which property owners receive solid waste collection services from the city. But the Department of Environmental Affairs carries out the inspections.

Before the June 30, 2006 enactment of the ordinance at issue,[5] the city collected a three-mill tax levied on commercial businesses and apartment buildings containing more than five units to finance a portion of its solid waste collection, disposal, and inspection operations. This millage generated $8 million in revenue. The city discontinued its reliance on the three-mill tax with the 2007-2008 fiscal year budget. It did so, according to the city, because it "could not continue to provide free residential trash services paid for solely by taxes and by an even greater amount of general fund monies, and fully fund other essential services . . . ." The city replaced the revenues generated by the three-mill tax with revenues from the commercial solid waste collection and disposal funds generated by a $300 annual fee for the Department of Public Works' residential trash collection service for each residence, and by the new solid waste inspection fee that is at issue in this case.

To implement the switch from the millage-generated revenue to the fee-generated revenue, the

---

[5] Detroit City Code, § 22-2-56.

Detroit City Council passed Ordinance 18-06 on June 30, 2006. This ordinance amended various ordinances within Chapter 22 of the Detroit City Code. Specifically, § 22-2-56 of the Detroit City Code authorized the new solid waste inspection fee and provided, in pertinent part:

> (c) From time to time, the Director of the Department of Public Works with the approval of City Council, may develop a schedule of fees for services including, but not limited to, inspections to ensure compliance with this section and for other services provided, exclusive of the rates charged for regular collection of commercial solid waste.

The purpose of this fee was to "ensure proper solid waste removal services exist."

At the time of the revenue source switch, the city estimated that the new solid waste inspection fee, in conjunction with the updated commercial waste collection and disposal charges, would generate $12.5 million in revenue for the city. With the revenue generated from the $300 annual residential trash collection fee, the new solid waste inspection fee, and the commercial solid waste charges, the city projected that it would collect approximately $74 million. This would, the city projected, save the city's general fund approximately $47 million.

The Detroit City Counsel later amended § 22-2-56(c), with the passage of Ordinance 23-07 to add the phrase "and industrial site solid waste" to the end of subsection (c). The purpose of these amendments was to authorize the city to impose an inspection fee for the inspection of commercial and industrial properties "to make sure they have made arrangements for trash disposal service, whether it is a private contractor or the City." Another purpose was to ensure that

"every business has an appropriate level of [solid waste collection] service" based on the amount of solid waste generated onsite.

On May 10, 2007, Pamela C. Scales, then budget director for the city, submitted a proposed schedule to the Detroit City Council of commercial solid waste inspections fees to be imposed pursuant to § 22-2-56(c). Scales proposed that the city charge an annual inspection fee of $250 to commercial properties of 10,000 or less square feet, $500 to commercial properties between 10,001 and 49,999 square feet, and $1,000 to commercial properties 50,000 or more square feet. The rates were varied to reflect the "additional effort involved in inspecting businesses of various size and type." According to Scales,

> [t]he schedule . . . had been developed th[r]ough meetings of a committee comprised of myself and personnel from the DPW, the Budget Department, the Finance Department's Treasury and Assessor divisions, and the Law Department. During that process, the City had not had the full opportunity to determine the all [sic] activity that would be required by the new and pro-active inspection program that the City sought to implement as of July 1, 2007, nor the costs of doing so.

Accordingly, these fee amounts reflected mere estimates of the costs of performing the inspections. The Detroit City Council approved Scales' proposed fee schedule on May 23, 2007.

Following the City Council's approval of the proposed fee schedule, and upon advice of legal counsel, Scales undertook a cost analysis in an effort to forecast the costs to be incurred in association with the inspections. She prepared a series of costs analyses between May 25, 2007, and June 26, 2007. Those analyses purportedly reflect the direct and indirect personnel and overhead

costs associated with the verification and inspection process. They contain a projected cost of $268.48 for each commercial property of 10,000 square feet or less, a projected cost of $321.72 for each commercial property of 10,001 to 49,999 square feet, and a projected cost of $476.30 for each commercial property of 50,000 or more square feet. In July 2007, the Detroit City Council approved the commercial solid waste inspection fee schedule, retaining the annual inspection $250 fee for properties of 10,000 or less square feet, but reducing the $500 fee for properties of between 10,001 and 49,999 square feet to $325, and the $1,000 fee for properties of 50,000 or more square feet to $475. According to Scales, she provided this adjusted fee schedule to the city treasurer and it was used for billing the fees on the summer tax statement.

Initially, and before the inspection process was implemented, there was considerable confusion regarding whether the inspection fee would be charged only to commercial property owners who do not contract with the Department of Public Works for waste removal service or whether the fee would be charged to all commercial properties regardless of whether the property owners contracted with Department of Public Works or a licensed private waste collector for solid waste removal services. On the one hand, Scales submitted a report to the Detroit City Council indicating that the inspection fee "will allow DPW to verify proof of service by requiring paid annual contracts with private collectors and ensure that the level of service is sufficient for the business." Moreover, the Detroit City Council adopted a resolution that approved the inspection fee schedule and which begins: "This Fee is [sic] Commercial and Residential Properties that opt out of the City of Detroit Department of Public Works Solid

Waste Pick up and Disposal Service. Proof of service with a licensed private solid waste collector is required."

On the other hand, a letter from the director of the city's Department of Public Works, dated July 21, 2007, and employing the salutation "Dear Property Owner," contradicted the city's representation that the fee related only to those property owners who do not have a contract with the city for waste removal services. The letter provides, in part:

> Starting this fiscal year (2007-2008), and continuing on an annual basis, the city will require property owners to provide proof of service with either the Department of Public Works or an approved private contractor for solid waste removal.
>
> If you already utilize the Department of Public Works for your solid waste services, this inspection fee is included in the contract amount. If you utilize a private contractor, you will be receiving this annual billing for the first time. Copies of non-DPW garbage service contracts should be presented to the Department of Public Works administrative office within 30 days of this billing.

Further, then-Detroit Mayor Kwame Kilpatrick's remarks to the Detroit City Council during his presentation of the proposed 2007-2008 city budget also cast confusion on the question whether the new solid waste inspection fee applied to all commercial properties. Those remarks are as follows:

> By ordinance, DPW is required to verify that every business that does not use DPW has an appropriate level of solid waste service provided by a licensed contractor. This budget also institutes an inspection fee for all businesses to make sure they have made arrangements for trash disposal service, whether it is a private contractor or the City.

> The fee is minimal .... It will pay for the cost of conducting inspections to make sure every business has an appropriate level of service. Every business operating in this city has a responsibility to take care of its own trash. This inspection program is designed to make sure that happens.

Once the inspection process was implemented, the city charged an inspection fee to *only* the owners of commercial and industrial property that contracted with licensed private solid waste collectors for solid waste collection and disposal services. The city charged the owners of commercial and industrial property under contract with the Department of Public Works for solid waste collection and disposal service only the service fees identified on the Department of Public Works' published solid waste collection rates. The city charged no inspection fee to commercial or industrial customers of the Department of Public Works.

According to Scales, the city charged a commercial solid waste inspection fee to 15,731 owners of commercial or industrial property within the city. "Of that total number of non-Department of Public Works accounts, 12,451 properties were billed $250.00 (79.15%); 2,517 were billed $325.00 (16%), and 763 were billed $475.00 (4.85%). The total amount billed for the solid waste compliance inspections was $4,293,200.00." Scales indicated that "[a]ll revenue collected by the fee charged for the inspection of those properties which do not elect to use DPW waste collection service is allocated in the City Budget to the Solid Waste Section" of the Department of Public Works. The following chart illustrates the various actions that the city took with respect to the new solid waste inspection fee.

| Fees/ Costs | Pre- 6/06 | 6/30/06 | 5/10/07 | 5/23/07 | 5/07- 6/07 | 7/07 | 2007- 2009 | 09/10 FY |
|---|---|---|---|---|---|---|---|---|
| | City collects 3-mill tax | City authorizes new Solid Waste Inspection Fee | Scales proposes new fee schedule | City approves proposed fee schedule | Scales projects costs. | City approves new fee schedule. | City implements new Solid Waste Inspection Fee | City intends to implement $200 flat fee |
| 10k or less | | | $250 | $250 | $268.48 | $250 | $250 | |
| 10,001 — 49,999 | | | $500 | $500 | $321.72 | $325 | $325 | |
| 50k or more | | | $1,000 | $1,000 | $476.30 | $475 | $475 | |

### B. WOLF

Wolf owns three parcels of commercial real property located within the city of Detroit and, allegedly, the city has charged him a solid waste inspection fee for each parcel, pursuant to § 22-2-56 of the Detroit City Code. On July 24, 2007, Wolf received a property tax and fees billing from the city for his property located at 5700 Woodward Avenue. The total billed includes a $475 charge for the solid waste inspection fee, despite the fact that Wolf contracts with the Department of Public Works for solid waste collection and disposal service for that property. That same day, Wolf received a similar billing for his property located at 120 Glynn Ct. That billing reflects only a "Solid

Waste Fee" of $3,000. Two days later, on July 26, 2007, Wolf received a property tax and fees billing from the city for his property located at 100 Glynn Ct. That billing likewise reflects only a "Solid Waste Fee" of $3,000. The city asserts that the latter two billings did *not* bill for the inspection fee. According to Wolf, however, the latter two billings *did* include the inspection fee. He paid all the inspection fees under protest. The latter two billings appear to be consistent with the fee charged by the Department of Public Works for solid waste collection and disposal services associated only with the use of four 400-gallon containers.

On August 9, 2007, Wolf commenced this original action in this Court with the filing of a complaint seeking declaratory relief, a damages award, and other relief. Wolf sought a declaration that the inspection fee constitutes a disguised tax and, therefore, the fee's imposition violates § 31 of the Headlee Amendment because the city imposed the tax without a vote of the city's electorate. Wolf also sought class certification.

By letter dated June 13, 2008, the city notified Wolf that an audit revealed that the city had erroneously charged Wolf an inspection fee for his property located at 5700 Woodward Avenue. The city stated that the "property has a Commercial Refuse Account with the City of Detroit . . . , and has been receiving weekly refuse collection services utilizing nine (9) — 400 gallon containers." The city further notified Wolf that it should have charged Wolf a solid waste collection fee of $6,500. The city then indicated that the city had credited the $475 fee paid against the solid waste collection fee owed and directed Wolf to "promptly remit $6025.00 in payment of the balance due for refuse collection for fiscal year 2007."

## II. FEE OR TAX

### A. STANDARD OF REVIEW

Wolf commenced this action, in part, for a declaratory judgment. "The purpose of a declaratory judgment is to enable the parties to obtain adjudication of rights before an actual injury occurs . . . ."[6] The plaintiff in a declaratory judgment action bears "the burden of establishing the existence of an actual controversy, as well as the burden of showing that . . . it has actually been injured or that the threat of imminent injury exists."[7]

Following various pleadings and motions, Wolf moved for summary disposition under MCR 2.116(C)(10), arguing that there is no genuine issue of material fact that the new solid waste inspection fee is an improperly imposed tax.

Under MCR 2.116(C)(10), a party may move for summary disposition on the ground that there is no genuine issue with respect to any material fact and the moving party is entitled to judgment as a matter of law. The moving party must specifically identify the undisputed factual issues and support its position with documentary evidence.[8] We must consider all the documentary evidence in the light most favorable to the nonmoving party.[9]

### B. THE PARTIES' POSITIONS

Wolf claims that the new solid waste inspection fee has all relevant indicia of a tax. He asserts that: (1) the

[6] *Rose v State Farm Mut Auto Ins Co*, 274 Mich App 291, 294; 732 NW2d 160 (2007).

[7] 22A Am Jur 2d, Declaratory Judgments, § 239, p 788.

[8] MCR 2.116(G)(3)(b) and (4); *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999).

[9] MCR 2.116(G)(5); *Maiden*, 461 Mich at 120.

fee has no relation to any service or benefit actually received by the taxpayer; (2) the amount of the fee has no relation to the cost incurred by the city in performing any service; (3) the fee is nothing more than a mechanism designed to generate revenue that the city is not obtaining from its waste collection charges, not to fund commercial solid waste inspection services; (4) the payor of the fee benefits in no manner distinct from any other taxpayer; (5) the fee is not voluntary, but mandatory; (6) the fee in not paid because of a use of service but because of a status as a property owner; and (7) failure to pay the fee can result in the city placing a lien on the subject property.

The city argues that the new solid waste inspection fee does not constitute a disguised tax. According to the city, the Detroit City Council authorized the fee for a regulatory purpose; that is, the ensuring of efficient removal of solid waste from commercial generators of waste and to protect the public health. Therefore, the city maintains, the inspection for which it charges the fee is a component of a comprehensive regulatory program that the city has implemented to ensure the safe and efficient collection and removal of solid waste from generation sites to licensed disposal sites.

The city points out that, although the new solid waste inspection fee will generate revenue, it will use the funds that the fee generates to defray the costs of executing and maintaining a regulatory program. Therefore, the city asserts, one must presume that the fee is proportionate to those costs. The city states that the fee will not generate revenue for the general fund and does not replace a tax. The city admits that the fee provides some benefit to the general public: protection of the public health. But, the city argues, the fee also benefits the fee payer by permitting the property owner

to use private refuse collection companies and by guaranteeing that the property owner will comply with the city's solid waste collection and disposal requirements. Thereby, the city asserts, the fee payer will avoid a blight citation, legal proceedings, and a civil fine. The city also asserts that the fee payer will benefit from an increase in the value of its property because its property will not become blighted.

The city also notes that the new solid waste inspection fee is voluntary because a property owner may escape the fee by contracting with the city for solid waste disposal services. As the city points out, although the prebilling correspondence that Wolf received from the city was confusing, in fact the city did not charge him an inspection fee for the two properties that the Department of Public Works services.

### C. THE HEADLEE AMENDMENT

Const 1963, art 9, § 31 provides, in relevant part:

> Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above the rate authorized by law or charter when this section is ratified, without the approval of a majority of the qualified electors of that unit of Local Government voting thereon.

The levying of a tax or an increase in the tax rate higher than that authorized by law at the time of the Headlee Amendment's adoption triggers application of this section of the Headlee Amendment.[10] The amendment invalidates either action unless the local unit of government secures voter approval.[11] However, a unit of

---

[10] *Bolt*, 459 Mich at 154, 158-159; *Saginaw Co v Buena Vista Sch Dist*, 196 Mich App 363, 366; 493 NW2d 437 (1992).

[11] Const 1963, art 9, § 31.

local government may institute a fee without violating the Headlee Amendment. Rather than being an exercise of the municipality's power to tax, the imposition of a fee constitutes an exercise of the municipality's police power to regulate public health, safety, and welfare.[12]

### D. THE *BOLT* INTERPRETATION

The Michigan Supreme Court addressed the distinction between a fee and a tax in *Bolt v City of Lansing*. The Court explained the distinction as follows: "Generally, a 'fee' is 'exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit.' A 'tax,' on the other hand, is designed to raise revenue."[13] The Court further identified the three criteria for a fee as follows: (1) a fee serves a regulatory purpose, (2) a fee is proportionate to the necessary costs of that service, and (3) a fee is voluntary.[14] "[T]hese criteria are not to be considered in isolation, but rather in their totality, such that a weakness in one area would not necessarily mandate a finding that the charge at issue is not a fee."[15]

Moreover, when evaluating these criteria, a court should consider whether the charge constitutes an investment in infrastructure;[16] whether the charge simply defrays the cost of a regulatory activity; whether the charge reflects the actual cost of use, metered with relative precision in accordance with available technol-

---

[12] *Bolt*, 459 Mich at 159; *Merrelli v St Clair Shores*, 355 Mich 575, 583; 96 NW2d 144 (1959).

[13] *Bolt*, 459 Mich at 161 (citations omitted).

[14] *Id.* at 161-162.

[15] *Graham v Kochville Twp*, 236 Mich App 141, 151; 599 NW2d 793 (1999); see also *Bolt*, 459 Mich at 167 n 16.

[16] *Bolt*, 459 Mich at 163.

ogy, including some capital investment component;[17] whether the charge corresponds to the benefits conferred; whether the charge applies only to those property owners who will enjoy the full benefits of the new construction or applies to all property owners; whether the ordinance imposing the charge lacks a significant element of regulation;[18] whether the payment of the charge is compulsory only for those who use the service; whether the users of the service have the ability to choose how much of the service to use; whether the users of the service have the ability to decide whether to use the service at all; whether the charge raises revenue to replace a portion of a program that was previously funded by a government's general fund;[19] whether the charge may be secured by the imposition of a lien; and whether the charge is billed through a governmental unit's assessor's office and is mailed with property tax statements.[20]

### E. APPLYING THE *BOLT* STANDARDS

### (1) REGULATORY VERSUS REVENUE-RAISING PURPOSE

The new solid waste inspection fee authorized by § 22-2-56 of the city's code satisfies the first fee criterion because it serves a regulatory purpose. The provisions of Chapter 22 of the Detroit City Code are intended to establish "a sanitary and satisfactory method of storage, preparation, collection, transport, disposal and placement of municipal solid waste, and for the maintenance of public and private property in a clean, orderly, and sanitary condition to ensure the

---

[17] *Id.* at 165.

[18] *Id.* at 167.

[19] *Id.* at 168.

[20] *Id.* at 169.

peace, health, safety, and welfare of the People of the City of Detroit." The purpose of the code amendment at issue is to allow the city to impose an inspection fee to enable it to inspect commercial and industrial properties "to make sure they have made arrangements for trash disposal service, whether it is a private contractor or the City," as well as to ensure that "every business has an appropriate level of [solid waste collection] service." The imposition of the fee allows for inspections that further both purposes expressed in Chapter 22, and, in so doing, bolsters the contention that the fee serves and furthers a regulatory purpose; that is, to ensure the efficient removal of solid waste products and to protect the public health by reducing blight and illegal dumping.[21]

Further, the manner in which the city implements the inspection process supports the conclusion that the fee serves a regulatory purpose. The city detailed this process in its answer to Wolf's interrogatory number 2 as follows:

> The inspection at issue is made for determine [sic] compliance with Chapter 22 of the Detroit City Code. The inspection involves two components. The first component is verification by personnel of the Department of Public Works (DPW) that a property owner has a contract for service with a licensed private solid waste collector. The second component is an inspection of the subject premises by an Environmental Control Inspector (ECI) with the Department of Environmental Affairs (DEA). Among the activity encompassed by an inspection, as provided by City Code Chapter 22, the inspector may request the owner to provide documented proof of private solid waste service; determine whether the level of service being provided by

---

[21] *Wheeler v Shelby Charter Twp*, 265 Mich App 657, 665; 697 NW2d 180 (2005); *Peninsula Sanitation, Inc v Manistique*, 208 Mich App 34, 40-41; 526 NW2d 607 (1994).

the private waste collector is sufficient, determine whether approved solid waste containers are present, identified and labeled, determine whether the solid waste containers are adequate in number, type, and size, determine whether solid waste containers are lawfully located; determine whether portable containers are located in loading and unloading areas, parking lots, construction and demolition sites, and significant pedestrian areas as may be required; determine whether solid waste is properly stored and separated; and determine whether there are no defective or unapproved containers. The inspector may issue one or more blight violations notices under the Solid Waste and Illegal Dumping provisions of the City Code.

We note that the city reduced the $500 fee for properties of between 10,001 and 49,999 square feet to $325, and the $1,000 fee for properties of 50,000 or more square feet to $475 after Scales performed her cost analysis. We further note that the city intends to reduce the inspection fee to $200 for each parcel, regardless of the size of the parcel to be inspected, beginning in fiscal year 2009-2010. These actions support the conclusion that the fees further a regulatory purpose, as opposed to merely a revenue generating purpose. The continuing reduction of the fee charged as the city refines the inspection process contradicts the notion that the city imposed the fee *solely* for the purpose of enhancing the city's revenue stream.

Wolf asserts that "[t]he City's failure to complete the inspections [for the 2007-2008 fiscal year] is further support for [his] contention that the City never intended to conduct all of the inspections and that the Inspection Fees were never intended to cover the actual costs of such inspection but rather were borne of a desire to assist the City in reducing its general overall deficit." Wolf correctly observes that the evidence generated clearly established that the city failed to inspect all the properties it was required to inspect during fiscal

year 2007-2008. The city failed to inspect either 2,113 or 2,361 tax-exempt properties that it had charged an inspection fee for the 2007-2008 fiscal year. Further, a review of the inspection reports that the inspectors generated during fiscal year 2007-2008, and that the city provided to Wolf for inspection, reveals that the Department of Environmental Affairs has no inspection reports for 2,824 taxable properties. The city concedes that it failed to inspect at least 2,113 tax-exempt properties that it assessed an inspection fee for fiscal year 2007-2008.

Thus, there is no question that the city failed to inspect all the properties that the ordinance required it to inspect during fiscal year 2007-2008. Wolf incorrectly infers that the city never intended to inspect all the properties that it charged a fee. From this inference, Wolf argues that the city imposed the fee solely to garner revenue. But the evidence does not support Wolf's inferences. The fact that the Department of Environmental Affairs initially believed that it would be inspecting between 500 and 5,000 properties stemmed from the lack of an accurate understanding by the Department of Environmental Affairs and the city of the number of inspections that the Department of Environmental Affairs would have to perform on an annual basis. It also reflects institutional lethargy in the accurate identification of properties requiring inspection and the provision of this information to the Department of Environmental Affairs.

It is certainly true that the Department of Environmental Affairs failed to inspect each property that the city charged an inspection fee for the 2007-2008 fiscal year. But this is largely attributable to the fact that the Department of Public Works first supplied the Department of Environmental Affairs with the Excel spread-

sheet listing the 15,572 taxable properties in January 2008, more than halfway through the 2007-2008 fiscal year. Further, the Department of Public Works did not provide the Department of Environmental Affairs with a list identifying the tax-exempt properties to be inspected for the 2007-2008 fiscal year until April, 2008. And the Department of Environmental Affairs apparently lacked sufficient time and resources to complete the overwhelming majority of inspections in the 5½ months that remained in the 2007-2008 fiscal year. Moreover, the Department of Environmental Affairs' record keeping during this period was exceedingly lax.

Finally, the evidence generated during supplemental discovery suggests that the city is attempting to eliminate the chaos associated with the initial implementation of the inspection process and to install a process by which it actually inspects each property subject to inspection. Indeed, Willa Williams, the general manager of the Department of Environmental Affairs, indicated that she is attempting to ensure that inspections the city conducts are performed in a regular, continuous, and systematic manner during the entire fiscal year. To this end, Williams has revamped the inspection process for the 2008-2009 fiscal year. According to Williams:

> [f]or 2008/2009, each ECI [Environmental Control Inspector] is given a daily "route sheet" listing 25 properties to be inspected, along with 25 corresponding inspection checklists. Inspectors are also provided with copies of a document entitled Frequently Asked Questions ("FAQ") . . . . Inspectors are required to provide a copy of the FAQ to those with whom they make contact at an inspection site. If no personal contact is possible, a copy of the FAQ is left at the premises. At the end of each day, inspectors return their completed checklists and corresponding route sheet to a Principal Environmental Control Inspector who counts and proofreads the checklists. The completed route sheets are signed and dated by the ECI

and the Principal. The route sheet and corresponding checklists are given to a clerical who checks the count and enters data from the completed checklists into an electronic database. . . . After entering inspection data in the electronic database, the clerical files the route sheet, checklist, and related communications to and from the property owners. The filed documents are maintained in order by parcel number.

Williams further indicated that the Department of Environmental Affairs no longer relies on the Excel spreadsheets that the Department of Public Works supplies. Instead, the Department of Environmental Affairs created its own "Access database" to track inspection activity. According to Williams, the Access database

allows for reports to be generated from the data recorded. DEA uses the Access database to generate a report entitled "Reconciliation Sheet." That report shows how many inspections have been completed as of any given day for each of the 22 wards, the number still to be inspected, the number of contacts received by DEA, and the percentage of inspections left to complete. DEA uses the Reconciliation Sheet to monitor the progress of inspections and to assign staff, as may be necessary to ensure that the DEA is on track to compete all 2008/2009 inspections by June 30, 2009.

A reconciliation sheet generated on June 12, 2009, indicates that, as of that date, the Department of Environmental Affairs had completed 98 percent of the inspections for fiscal year 2008-2009.[22]

The switch to the Access database also made it possible for the city to equip some of the inspectors with "a portable computer known as a Toughbook." As Williams explained:

---

[22] In her June 15, 2009 affidavit, Williams stated that, on the basis of its performance of inspections during the 2008-2009 fiscal year, she anticipated that the Department of Environmental Affairs would complete all inspections for fiscal year 2008-2009 before June 30, 2009.

The Toughbook contain[s] a computerized inspection checklist from the Access database into which inspection data is entered by the ECI. The Toughbook data entry replaces use of the printed checklist. When a Toughbook is used, the ECI's [sic] still uses a printed route sheet which is completed and reviewed by a Principal at the end of each day. The daily inspection information in the Toughbook is uploaded to the DEA's computer system which is then incorporated by a DEA computer specialist into the Access database.

On this record, the only inference we can reasonably draw from the city's failure to complete each and every inspection required in the 2007-2008 fiscal year is that it launched the inspection program before it had worked out the details of the process. Such an inference does not, however, support a conclusion that the city intended the new solid waste inspection fee solely to generate revenue.

Wolf concentrates on the fact that the new solid waste inspection fee generates revenue for the Department of Public Works. But the fact that the fee generates such revenue does not conclusively establish that it is a tax. "[A] regulatory fee can have dual purposes and still maintain its regulatory characterization. As long as the primary purpose of a fee is regulatory in nature, the fee can also raise money provided that it is in support of the underlying regulatory purpose . . . ."[23]

Here, the new solid waste inspection fee generates revenue in support of an underlying regulatory purpose. The fact that the inspections that the Department of Environmental Affairs performs generate funds for the operations of the Department of Public Works does not establish, as a matter of law, an intent by the city to raise revenue under the guise of implementing a police power regulation. Chapter 22 of the Detroit City Code charges

---

[23] *Westlake Transp, Inc v Pub Serv Comm*, 255 Mich App 589, 613; 662 NW2d 784 (2003).

the Department of Public Works with the overall responsibility for solid waste collection and disposal within the city. The inspections ensure commercial and industrial properties within the city are under contracts for trash disposal service, either with a private contractor or the city. And the inspections ensure that the service the property owner contracts for is adequate to handle the amount of solid waste that the property generates. The fees these inspections generate allow the city to "administer" Chapter 22 so as to reduce illegal dumping and ensure compliance with Chapter 22. The purposes and consequences of the Department of Environmental Affairs' inspections are related to the solid waste collection and disposal goals that the Department of Public Works addresses. Consequently, the city's use of the fees to further solid waste collection and disposal does not demonstrate, as a matter of law, an intent on the part of the city to raise revenue under the guise of a police power regulation.[24]

### (2) PROPORTIONALITY OF THE FEE TO THE SERVICE PROVIDED

With regard to the second criterion, "[f]ees charged by a municipality must be reasonably proportionate to the direct and indirect costs of providing the service for which the fee is charged."[25] This Court must presume that the amount of the fee is reasonable, "unless the contrary appears on the face of the law itself or is established by proper evidence . . . ."[26]

---

[24] *Saginaw Co v John Sexton Corp of Mich*, 232 Mich App 202, 212-213; 591 NW2d 52 (1998).

[25] *Kircher v City of Ypsilanti*, 269 Mich App 224, 231-232; 712 NW2d 738 (2005).

[26] *Wheeler*, 265 Mich App at 665-666, quoting *Graham*, 236 Mich App at 154-155, quoting *Vernor v Secretary of State*, 179 Mich 157, 168; 146 NW 338 (1914) (quotation marks omitted).

The Detroit City Council initially adopted a fee schedule of $250 for commercial properties 10,000 or less square feet, $500 for commercial properties between 10,001 and 49,999 square feet, and $1,000 for commercial properties 50,000 or more square feet. Scales developed this fee schedule on the basis of estimates of the costs of performing the inspections. The city never implemented this fee schedule. Rather, the Detroit City Treasurer bills each commercial and industrial property an inspection fee from the revised fee schedule that it generated in response to Scales' May/June 2007 costs analysis. Scales' cost analysis, which purports to reflect the direct and indirect personnel and overhead costs associated with the verification and inspection process, revealed, as shown above, a projected cost of $268.48 for each inspection of commercial property of 10,000 square feet or less, a projected cost of $321.72 for each inspection of commercial property of 10,001 to 49,999 square feet, and a projected cost of $476.30 for each inspection of commercial property of 50,000 or more square feet. According to Scales, on the basis of her cost analysis, the city retained the $250 annual inspection fee for properties of 10,000 or less square feet, but reduced the $500 fee for properties of between 10,001 and 49,999 square feet to $325, and the $1,000 fee for properties of 50,000 or more square feet to $475. According to Scales, these fee amounts constitute "reimbursement for our estimated cost of performing the inspections citywide."

Scales admitted that she based her cost analysis on estimates that the city generated before it actually implemented the inspection process. She stated that a new cost analysis would have to be performed once the city had finalized the inspection process. However, beginning with the 2009-2010 fiscal year, the city intends to reduce the inspection fee to $200 for each

parcel, regardless of the size of the parcel to be inspected. The fact that the city intends to reduce the fees charged to a single flat fee is a strong indicator that the fees actually charged were disproportionate.

Nevertheless, affidavits and deposition testimony that both Scales and Mauricio Kohn[27] provided reflect their good-faith attempts, and hence the city's good-faith attempts, to determine a reasonable fee on the basis of the information then existing and available to them. The evidence also suggests that the source of any disproportionality in the fees that the city actually charged is not an intent on the part of the city to generate a revenue stream outside its taxing power by subterfuge. Rather, the evidence suggests that the city's lack of preparedness to implement the solid waste disposal inspection process and its resulting inept launching of the inspection process caused any such disproportionality.

### (3) VOLUNTARY CRITERION

With regard to the third criterion—whether the fee contains any element of volition—the parties' documentation establishes that the fee is voluntary. The fee applies only to those properties for which the owners do not contract with the city's Department of Public Works for solid waste removal services. Consequently, the property owner may choose to avoid paying the new

---

[27] Mauricio Kohn is an expert hired by the city to evaluate the reasonableness of Scales' cost analysis in an effort to forecast the costs to be incurred by the city in the performance of the inspections. We mention his involvement only to further demonstrate that the city engaged him in a good-faith attempt to determine "what would be a reasonable amount for the City of Detroit . . . to charge as a fee to conduct inspections of property owners that do not use the City's Solid Waste Collection Services . . . , so as to assure that the fee is reasonably proportionate to cover the direct and indirect costs of providing these services."

solid waste inspection fee by simply contracting with the Department of Public Works for solid waste collection and disposal services. The voluntary aspect of the fee suggests that the fee is not a disguised tax.

### (4) ADDITIONAL FACTORS

The fact that the city bills the inspection fee on the property owner's tax bill and may place a lien on the property owner's parcel in the amount of the fee does not transform an otherwise proper fee into a tax.[28]

### III. CONCLUSION

The first and third *Bolt* criteria support a conclusion that the new solid waste inspection fee is a fee, not a hidden tax. The fee serves a recognized regulatory purpose. The property owner determines whether that owner's property is subject to the fee by the owner's choice on how to dispose of the solid waste that the owner's use of that property generates. Further, the good-faith attempts on the city's part to determine a reasonable fee on the basis of the information then existing and available to it support the conclusion that the new solid waste inspection fee is a valid fee and not a disguised tax.

In sum, we conclude that the new solid waste inspection fee constitutes a poorly launched, but nonetheless permissible, regulatory fee. Therefore, it is not a tax that implicates the Headlee Amendment.[29] Accordingly, we deny Wolf's motion for summary disposition and enter summary disposition in favor of the city.[30] Because our resolution on this issue is dispositive, Wolf's motion for class certification is moot.

[28] *Bolt*, 459 Mich at 168.

[29] Const 1963, art 9, § 31.

[30] MCR 2.116(I)(2).