*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PLATT CONVENIENCE, INC., on Behalf of Itself
and All Others Similarly Situated,

        Plaintiff,

v

CITY OF ANN ARBOR,

        Defendant.

FOR PUBLICATION
October 04, 2024
2:15 PM

No. 359013

Before: M. J. KELLY., P.J., and MARKEY and REDFORD, JJ.

PER CURIAM.

Pursuant to Const 1963, art 9, § 32, plaintiff commenced this original action in this Court, alleging violations of § 31 of the Headlee Amendment, Const 1963, art 9, § 31. To summarize broadly, plaintiff alleges that the storm-sewer charges imposed by defendant City are an unlawful disguised tax for purposes of Headlee § 31, rather than a valid user fee. Plaintiff's complaint was accompanied by a motion requesting certification of a plaintiff class "consisting of all persons or entities who/which have paid or incurred Stormwater Charges imposed by the City of Ann Arbor . . . at any time between October 21, 2020 and October 21, 2021 and/or who/which pay the City or incur Stormwater Charges during the pendency of this action . . . ." Following initial review, this Court referred the matter to Washtenaw Circuit Court for proceedings before a special master pursuant to MCR 7.206(E)(3)(d).[1] Following discovery, the parties filed competing motions for summary disposition. For the reasons explained below, we now deny plaintiff's motion for class certification and grant summary disposition in favor of defendant City pursuant to MCR 2.116(C)(10).

---

[1] *Platt Convenience Inc v City of Ann Arbor*, unpublished order of the Court of Appeals, entered April 1, 2022 (Docket No. 359013).

## I. FACTUAL AND PROCEDURAL BACKGROUND

The material facts are largely undisputed. Defendant City maintains a municipal stormwater drainage system separate from, and in addition to, its sanitary sewer system. Stormwater runoff is created when excess water that cannot be absorbed into the ground or that flows off impervious surfaces enters the City's stormwater drainage system. The drainage system collects stormwater runoff and diverts the stormwater to appropriate points of discharge, which includes waterways within the City, and eventually the Huron River. The system is, in a word, extensive.[2] Among other things, the system includes nearly 50,000 "street trees" and other "green infrastructure," such as rain gardens.[3] According to defendant, the separate storm-sewer system has been in operation, in one form or another, since 1980.

The parties agree that defendant City computes a given parcel's stormwater drainage charge on the estimated use of the stormwater system, as measured by the total amount of impervious surface on a property. The administrator has established a four-tiered charging structure for single-family and two-family residential properties. According to plaintiff, as of June 30, 2021, the rates in effect for single- and two-family residential properties were as follows:

- "Tier 1" consists of properties with up to 2,187 square feet of impervious surfaces, all of which are assessed a quarterly charge of $31.55.

- "Tier 2" consists of properties with 2,188 to 4,175 square feet of impervious surfaces, all of which are assessed a quarterly charge of $55.22.

- "Tier 3" consists of properties with 4,176 to 7,110 square feet of impervious surfaces, all of which are assessed an quarterly charge of $94.

---

[2] According to defendant, the system "includes 231 miles of pipes and culverts, 7,053 manholes, 212 outfalls, 2 surface detention basins, 783 miles of roadway curb and gutters, and nearly 11,000 inlets and catch basins[.]"

[3] According to defendant City, it considers its "street trees" to be a component of the City's stormwater drainage system, and, thus, such trees "are maintained as part of the stormwater sewer which the system funds because they provide significant storm water management benefits to the system." Specifically, defendant alleges that, on an annual basis, its "public trees intercept 65 million gallons of stormwater"; "decrease the quantity of stormwater run-off and improve the quality of run-off that eventually reached local lakes, streams, and reservoirs"; "slow down stormwater run-off and promote ground water infiltration"; "take up water through their root systems and release it to the atmosphere through evaporation, facilitating greater water storage potential in soils and increasing the amount of time before rainfall becomes run-off"; "take up nutrients and potentially harmful chemicals from stormwater run-off," in effect filtering out pollutants; and that the "urban forest canopy, along with tree branches, bark, and mosses, captures and stores precipitation, delaying the onset of peak flows and reducing the total amount of run-off that reaches urban waterways via the storm drain system."

- "Tier 4" consists of properties with over 7,110 square feet of impervious surfaces, all of which are assessed a quarterly charge of $165.66.

Plaintiff further represents that commercial and other properties are billed at a quarterly rate of $851.44 per impervious acre. Additionally, all properties incur a $4.15 customer service charge per quarter. The City does not charge properties that have only pervious surfaces, e.g., undeveloped parcels. Additionally, the City does not assess a stormwater charge against itself for its public streets and roads, purportedly in light of the "benefits provided by virtue of the fact that they act as a stormwater conveyance system within the overall system, and therefore not only burden the system, but provide a direct benefit to the overall stormwater system."

By ordinance, payment of the charges is compulsory and any related debt is secured by the realty itself—the City is afforded a lien on the subject property for any unpaid charges and may recoup such charges, if left unpaid for a certain period of time, by rolling them into the property taxes assessed against the parcel. Ratepayers are, however, entitled to receive credits against the stormwater-drainage charge for actions taken to reduce stormwater runoff from their respective properties. For example, ratepayers may receive a credit by installing and maintaining "rain barrels, rain gardens, cisterns, dry wells, bioswales, and other water quality controls[.]"

Plaintiff commenced the instant original putative class action in October 2021, filing a single-count complaint alleging that the stormwater charges constitute a disguised tax and, therefore, the imposition of those charges without voter approval was in violation of § 31 of the Headlee Amendment. In a nutshell, plaintiff alleged that the disputed charges possess all the relevant indicia of a tax because they (1) serve a revenue-raising, rather than a regulatory, purpose; (2) are disproportionate to the City's actual cost of providing stormwater disposal services; (3) the ratepayers benefit in no manner distinct from any other taxpayer or the general public; and (4) payment of the charges is not voluntary. In terms of relief, plaintiff asked that this Court:

A. Certify this action to be a proper class action with Plaintiff certified as Class Representative and [plaintiff's counsel] designated Class Counsel;

B. Define the Class to include all persons or entities who/which have paid the City or incurred Stormwater Charges to the City at any time in the one year preceding the filing of this lawsuit and/or who/which pay the City or incur Stormwater Charges during the pendency of this action (the "Class Period");

C. Enter judgment in favor of Plaintiff and the Class and against the City;

D. Order and direct the City to disgorge and refund all Stormwater Charges collected during the Class Period and to pay into a common fund for the benefit of Plaintiff and all other members of the Class the total amount of Stormwater Charges to which Plaintiff and the Class are entitled;

E. Find and declare that the Stormwater Charges are unlawful taxes imposed in violation of the Headlee Amendment;

F.  Permanently enjoin the City from imposing or collecting any Stormwater Charges, unless those Charges receive voter approval in conformance with the Headlee Amendment;

G.  Award Plaintiff and the Class the costs and expenses incurred in this action, including reasonable attorneys', accountants', and experts' fees[.]

After considering the parties' initial filings, we denied defendant's initial requests for summary dismissal under MCR 2.116(C)(6) and (C)(8) and instead ordered further proceedings before the Special Master.[4]  Discovery ensued.  According to the Special Master, during a status conference held below, "[t]he parties stipulated . . . that, because the matter is an 'action,' albeit before the Court of Appeals, Motions for Summary Disposition present[ed] an appropriate mechanism by which [the trial court could] fulfill its obligations as special master."[5]  Thus, the parties ultimately filed competing motions for summary disposition, which they supported with *voluminous* appendices.[6]

After entertaining oral argument on both the motions for summary disposition and plaintiff's motion for class certification, the Special Master issued her report (the "SM Report") recommending that this Court grant defendant City's motion for summary disposition under MCR 2.116(C)(7) or, in the alternative, MCR 2.116(C)(10).  The Special Master also issued a proposed opinion and order recommending denial of plaintiff's motion for class certification.

After the Special Master issued her report, plaintiff sought and was granted additional time to file objections to it in this Court, but we specifically ruled that plaintiff would be "limited to one brief" in support of "its objections to the Special Master's findings and conclusions."[7]  Plaintiff filed a motion to "strike and/or vacate" the SM Report, and a brief in support of its objections to the SM report.  We denied plaintiff's motion to strike the SM Report.[8]  In the brief in support of

---

[4] We also denied defendant's ensuing motion for reconsideration of that order, *Platt Convenience Inc v City of Ann Arbor*, unpublished order of the Court of Appeals, entered July 8, 2022 (Docket No. 359013), and our Supreme Court denied defendant's related attempt to seek interlocutory review in that Court, *Platt Convenience, Inc v City of Ann Arbor*, ___ Mich ___; 986 NW2d 597 (2023).

[5] Indeed, at the hearing that was later held before the Special Master on the parties' competing motions for summary disposition, when asked what evidence he would present at trial if the motions for summary disposition were denied, plaintiff's counsel responded, in part: "[B]oth sides are here because both sides don't think that there are material facts in dispute."

[6] Standing alone, plaintiff's five-volume appendix in support of its motion for summary disposition spans nearly 1,200 pages, while defendant's 29-volume appendix in support of its motion for summary disposition sprawls across more than 7,500 pages.

[7] *Platt Convenience Inc v City of Ann Arbor*, unpublished order of the Court of Appeals, entered September 7, 2023 (Docket No. 359013).

[8] *Platt Convenience Inc v City of Ann Arbor*, unpublished order of the Court of Appeals, entered November 16, 2023 (Docket No. 359013).

plaintiff's objections to the SM Report, plaintiff attempts to incorporate by reference several arguments that were raised in its already-denied motion to strike the SM Report.

## II. ANALYSIS

### A. GOVERNING LEGAL PRINCIPLES AND THE STANDARD OF "REVIEW"

MCR 1.103 provides:

> The Michigan Court Rules govern practice and procedure in all courts established by the constitution and laws of the State of Michigan. Rules stated to be applicable only in a specific court or only to a specific type of proceeding apply only to that court or to that type of proceeding and control over general rules.

When exercising original jurisdiction over an action like the one at bar, this Court is, in effect, sitting as a trial court, not an appellate court. Accordingly, in such cases, in addition to the provisions in MCR subchapter 7.200 that ordinarily govern proceedings in this Court, the court rules that usually govern civil actions in trial courts are generally applicable. See *Bolt v City of Lansing (On Remand)*, 238 Mich App 37, 59; 604 NW2d 745 (1999) ("Clearly, Rule 3.501, *along with all other court rules*, applies in the Court of Appeals pursuant to MCR 1.103.") (emphasis added). Consequently, in original actions like this one, motions for summary disposition under MCR 2.116 are properly filed in this Court. See, e.g., *Taxpayers for Mich Constitutional Gov't v Dep't of Technology, Mgt & Budget*, 508 Mich 48, 67; 972 NW2d 738 (2021) ("we affirm the Court of Appeals' grant of summary disposition to the state defendants"); *Adair v Michigan*, 317 Mich App 355, 359; 894 NW2d 665 (2016) (granting a motion for summary disposition in the context of an original Headlee action filed in this Court).

However, because this Court is most accustomed and acclimated to sitting as an error-correcting appellate court, it "is poorly suited and equipped for factual development of new claims[.]" See *Okrie v Michigan*, 306 Mich App 445, 458; 857 NW2d 254 (2014). For that reason, in original Headlee actions, if this Court "determines that the issues framed . . . present factual questions for resolution, the panel must"—as occurred here—"refer the suit to a judicial circuit for the purposes of holding pretrial proceedings, conducting a hearing to receive evidence and arguments of law, and issuing a written report for the panel setting forth proposed findings of fact, and conclusions of law." See MCR 7.206(E)(3)(d).

In their instant briefs, the parties disagree as to what "standard of review" we ought to employ in reviewing the Special Master's proposed findings of fact and conclusions of law. Such arguments are mostly irrelevant, particularly given the current procedural stance of this case. "A special master . . . exercises the powers conferred upon him [or her] subject to the judge's power to substitute his [or her] own independent judgment at any time for the judgment of the special master[.]" *Rockwell v Bd of Ed of Sch Dist. of Crestwood*, 393 Mich 616, 644-645; 227 NW2d

736 (1975).[9]  In other words, all recommended "findings" and "conclusions" offered by the Special Master are merely that—*recommendations* as to how this Court should rule, not rulings in and of themselves.  And because this Court is exercising original jurisdiction over this action, rather than appellate jurisdiction, it would be a misnomer to refer to a standard of "review."  See *Black's Law Dictionary* (11th ed) (defining the phrase "standard of review" as "[t]he criterion by which an appellate court exercising appellate jurisdiction measures the constitutionality of a statute or the propriety of an order, finding, or judgment entered by a lower court").  Furthermore, even if we were exercising appellate jurisdiction here, our review of the Special Master's main disputed recommendation—i.e., that this Court should grant summary disposition to defendant—would, of course, be de novo.[10]  See, e.g., *Heaton v Benton Constar Co*, 286 Mich App 528, 531; 780 NW2d 618 (2009).

As noted, the Special Master recommended that we rule in defendant's favor under MCR 2.116(C)(7) or (C)(10).  But because we conclude that summary disposition is warranted under MCR 2.116(C)(10), we limit our discussion to that particular sub rule and neither consider nor decide whether summary disposition might also be warranted under subrule (C)(7).[11]

As this Court explained in *Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013):

> A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim.  Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law.  In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial.  A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ.  [Quotation marks and citations omitted.]

The "court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if *material* evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10)."  *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013) (emphasis added).  "Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient."  *McNeill-Marks v MidMichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016).  "This Court is liberal

---

[9] Accord *Campbell v Evans*, 358 Mich 128, 131; 99 NW2d 341 (1959) ("The responsibility for the ultimate decision and the exercise of judicial discretion in reaching it still rests squarely upon the trial judge.  These grave prerogatives he [or she] may never delegate to others.").

[10] We note that, at oral argument, plaintiff's counsel conceded that it would be appropriate for this Court to engage in "complete de novo review" of the competing motions for summary disposition.

[11] "This Court generally does not address moot questions or declare legal principles that have no practical effect in a case."  *In re Pollack Trust*, 309 Mich App 125, 154; 867 NW2d 884 (2015).

in finding genuine issues of material fact." *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008).

The moving party bears the initial burden of production, which may be satisfied "in one of two ways." *Quinto v Cross & Peters Co*, 451 Mich 358, 361; 547 NW2d 314 (1996). "First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* at 362 (quotation marks and citation omitted). Once the moving party satisfies its burden in one of those two ways, "[t]he burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists." *Id.*

Our "review is limited to . . . the evidence properly presented[.]" *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 380; 775 NW2d 618 (2009) (*Barnard*). That is, this Court may only consider the "substantively admissible evidence actually proffered" by the parties. *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999). "Trial courts are not the research assistants of the litigants; the parties have a duty to fully present their legal arguments to the court for its resolution of their dispute." *Walters v Nadell*, 481 Mich 377, 388; 751 NW2d 431 (2008). As such, this Court will not "scour the record to determine whether there exists a genuine issue of fact," instead focusing only on those "specific facts" that have been duly "set forth" by the parties. *Barnard*, 285 Mich App at 381 (quotation marks and citations omitted). See also MCR 2.116(G)(4) ("an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial").

## B. CLASS CERTIFICATION

Before addressing the merits of the parties' competing motions for summary disposition, we first consider plaintiff's motion for class certification. We deny that motion in light of plaintiff's failure to demonstrate that it will adequately represent the diverse—and sometimes conflicting—interests of all of the distinct subclasses within the proposed class.

The ordinary court rules governing class certification apply with equal force in this original action. See *Bolt (On Remand)*, 238 Mich App at 59. As particularly relevant here, MCR 3.501(A) provides:

> (1) One or more members of a class may sue or be sued as representative parties on behalf of all members in a class action *only if*:
>
> (a) the class is so numerous that joinder of all members is impracticable;
>
> (b) there are questions of law or fact common to the members of the class that predominate over questions affecting only individual members;
>
> (c) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

(d) *the representative parties will fairly and adequately assert and protect the interests of the class*; *and*

(e) the maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice. [Emphases added.]

For a class to be certified, "the action must meet *all* the requirements in MCR 3.501(A)(1); a case cannot proceed as a class action when it satisfies only some, or even most, of these factors." *A & M Supply Co v Microsoft Corp*, 252 Mich App 580, 597; 654 NW2d 572 (2002). "The burden of establishing that the requirements for a certifiable class are satisfied is on the party seeking to maintain the certification." *Hanton v Hantz Fin Servs, Inc*, 306 Mich App 654, 661; 858 NW2d 481 (2014).

Plaintiff asks us to certify "a class consisting of all persons or entities who/which have paid or incurred Stormwater Charges imposed by the City of Ann Arbor . . . at any time between October 21, 2020 and October 21, 2021 and/or who/which pay the City or incur Stormwater Charges during the pendency of this action . . . ." In our estimation, that request is fatally flawed because, far from carrying their burden regarding the "adequacy" requirement under MCR 3.501(A)(1)(d), plaintiff and its counsel have affirmatively demonstrated that they will *not* adequately safeguard the interests of all members of the proposed class.

"To show adequacy, the proponents must show that (1) counsel is qualified to pursue the proposed class action, and (2) the members of the class do not have antagonistic or conflicting interests." *Duskin v Dep't of Human Servs*, 304 Mich App 645, 657; 848 NW2d 455 (2014). In analyzing that latter "adequacy" question, the Special Master wrote:

Plaintiff's claims, if successful, will serve to damage most of the proposed class, who will end up paying more through taxes for the same service than they are paying now through user fees. (Praschan Aff., Appx. C, ¶¶ 14-16.) The owners of residential homes—an estimated 21,344 customers, or about 84% of all the properties that receive and pay for stormwater utility services—will pay more, while Plaintiff will pay less going forward. (*Id*.; see also, Wingle Aff., Appx. E, p. 172, ¶¶ 10-11.) Yet other members of the class—namely, the huge numbers of tax-exempt property owners and tenants—will pay nothing. (*Id*.) Plaintiff has not sufficiently established how it can adequately represent the interests of a majority of the proposed class who will end up damaged through having to pay more through taxes for the same services now paid for by fees. The evidence demonstrates that Plaintiff's interests in the outcome of this case are different than, and are in fact inapposite to, the interests of most of its proposed class members. Because of this, Plaintiff is an inadequate class representative. [Record citations in original.]

In its objections to the Special Master's proposed opinion in that regard, plaintiff does not cite any record evidence to rebut the Special Master's pertinent proposed findings, instead arguing in a conclusory fashion:

Finally, there is no conflict of interest between Plaintiff and the members of the proposed class. Plaintiff's claims and the claims of the class arise from the City's imposing the improper Stormwater Charges which is an unlawful collection of a tax in violation of the Headlee Amendment. The Stormwater Charges are of the same type for each member of the proposed class, and each class member suffered injury as a result of the City's collection of the illicit tax. There is no conflict that goes to the subject matter of the lawsuit, and, therefore, the class should be certified.

If anything, that argument serves to confirm that plaintiff and its counsel will not adequately protect the interests of all—or even most—of the proposed class members. Plaintiff does not dispute that different subgroups within the proposed class have markedly different economic interests in the outcome of this case. To focus on the most obvious example, the myriad tax-exempt entities in defendant City stand to gain considerably while facing no downside risk; if the charges in this case are found to be unlawful disguised *taxes* under Headlee § 31, then the tax-exempt entities will, by virtue of their tax-exempt status, no longer be forced to pay the disputed storm-sewer charges and will nevertheless continue to reap the related benefits.[12] On the other hand, the majority of the proposed class (i.e., the residential ratepayers) face the risk of an increase in their real-world, out-of-pocket costs as a result of the disputed charges—including the portion formerly paid for by tax-exempt entities—being shifted over to the municipal property-tax rolls. And as explained at greater length *infra*, because funding the disputed storm-sewer services is compulsory under federal law, that risk is not one that the residential ratepayers would necessarily be able to avert by popular vote.[13]

Despite the existence of such clear potential conflicts of interest between readily identifiable subgroups in the proposed class, plaintiff rejects at such concerns, tacitly suggesting that, real-world fiscal impacts aside, the adequacy requirement is satisfied here because all of the

---

[12] As explained in more detail *infra*, given that the disputed storm-sewer services must be provided under the National Pollutant Discharge Elimination System (NPDES) established by the Clean Water Act, 33 USC 1281 *et seq*., whether the economic burden is ultimately borne by municipal ratepayers, municipal taxpayers, or state taxpayers, there is no question that it *will* be borne. See 33 USC 1319(e) ("Whenever a municipality is a party to a civil action brought by the United States under this section, the State in which such municipality is located shall be joined as a party. Such *State shall be liable for payment* of any judgment, or any expenses incurred as a result of complying with any judgment, entered against the municipality in such action *to the extent that the laws of that State prevent the municipality from raising revenues needed to comply with such judgment*.") (emphasis added); 33 USC 1319(b) (granting the EPA Administrator the power "to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order under subsection (a)," including violations of NPDES-permit requirements); *American Axle & Mfg, Inc v City of Hamtramck*, 461 Mich 352; 604 NW2d 330 (2000) (holding that judgment levies added to the tax rolls pursuant to MCL 600.6093 are not subject to Headlee voter-approval requirements because the imposition of such levies was authorized by law when the Headlee amendment was ratified).

[13] See footnote 12, *supra*.

class members have been subjected to a constitutional "injury" in the form of an unlawful tax exaction. Perhaps some of the residential ratepayers in the proposed class would share plaintiff's view that it is better for them to risk paying considerably more for the same services if doing so ensures that Headlee § 31 is being duly enforced. But others might, perhaps, take the more practical view of valuing cash in hand above victories in legal claims. On that basis alone, we are obliged to deny the motion for class certification. See *Duskin*, 304 Mich App at 658 (holding that a trial court had clearly erred in finding that the "adequacy" requirement was satisfied based on the proposed class representatives' "bare allegations" regarding "a lack of conflicting interests among the representative parties and class members"); *A & M Supply*, 252 Mich App at 597 ("the action must meet *all* the requirements in MCR 3.501(A)(1); a case cannot proceed as a class action when it satisfies only some, or even most, of these factors."). Accord *Amchem Products, Inc v Windsor*, 521 US 591, 626; 117 S Ct 2231; 138 L Ed 2d 689 (1997) ("[N]amed parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses. In significant respects, the interests of those within the single class are not aligned. Most saliently, for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future.").

## C. EXPERT-OPINION EVIDENCE

Given that our review under MCR 2.116(C)(10) is limited to the substantively admissible evidence proffered by the parties, before delving into the merits, we must consider and decide certain challenges that plaintiff has raised to some of defendant's expert-opinion evidence. Plaintiff raises two distinct varieties of objection in that regard. We address each in turn.

First, plaintiff argues that several of the defense experts offered improper opinions regarding questions of law—in particular, the ultimate legal question of whether the disputed charges in this case qualify as proper user fees, rather than unlawful taxes, under the test enumerated in *Bolt v City of Lansing*, 459 Mich 152; 587 NW2d 264 (1998). We agree with plaintiff that, to the extent that defendant's experts offered testimony or reports directly opining on legal questions, such as whether the disputed charges are disguised taxes under Headlee § 31 or what a municipality must do to satisfy the demands of *Bolt*, such evidence must be disregarded as substantively inadmissible. See *Bolt*, 459 Mich at 158 ("Whether the storm water service charge . . . is a 'tax' or a 'user fee' is a question of law"); *Lenawee Co v Wagley*, 301 Mich App 134, 160-161; 836 NW2d 193 (2013) ("The opinion of an expert may not extend to the creation of new legal definitions and standards and to legal conclusions. Additionally, an expert witness may not give testimony regarding a question of law, because it is the exclusive responsibility of the trial court to find and interpret the law.") (quotation marks, citations, brackets, and ellipsis omitted).

Second, plaintiff argues that some of the opinions proffered by defendant's proposed experts "must be . . . excluded" from consideration as inadmissible under MRE 702[14] and MRE

---

[14] MRE 702 provides:

703[15] because the experts in question are "not qualified" to render the disputed opinions and the underlying "facts and data" on which the experts relied are not "in evidence." Plaintiff also raises a *Daubert*[16] challenge, arguing that one proposed defense expert's opinion concerning the value of the municipal roadways, when considered as a part of the storm-sewer infrastructure, is "based upon an unreliable and untested methodology[.]" We agree with plaintiff that the Special Master did not properly address these challenges when they were raised before her. And in many cases, we would likely find it necessary to refer this matter back to her for further factual development before we ruled. Under the unique circumstances at bar, however, we find it is unnecessary to refer this matter back to the Special Master for a *Daubert* hearing because, assuming that the disputed expert opinions are *not* substantively admissible for purposes of summary disposition, that would not alter our ultimate conclusion that defendant is entitled to summary disposition under MCR 2.116(C)(10).

As a general rule, "there is no requirement that an expert's qualifications and methods be incorporated into an affidavit submitted in support of, or opposition to, a motion for summary disposition. Rather, the *content* of the affidavits must be admissible in *substance*, not form." *Dextrom v Wexford Co*, 287 Mich App 406, 428; 789 NW2d 211 (2010). However, trial courts have a "gatekeeping obligation" under MRE 702, which obliges them "to review *all* expert opinion testimony" for admissibility under that rule. *Craig v Oakwood Hosp*, 471 Mich 67, 82; 684 NW2d 296 (2004). "This gatekeeper role applies to *all* stages of expert analysis. MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). "While a party may waive any claim of error by failing to call this gatekeeping obligation to the court's attention, the court *must* evaluate expert testimony under MRE 702 once that issue is raised." *Craig*, 471 Mich at 82. Moreover, a party need not wait until

---

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

[15] MRE 703 provides: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. The facts or data must be in evidence--or, in the court's discretion, be admitted in evidence later."

[16] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

-11-

trial to raise such a challenge; rather, the issue is properly raised at summary disposition. See, e.g., *Elher v Misra*, 499 Mich 11, 14; 878 NW2d 790 (2016); *Amorello v Monsanto Corp*, 186 Mich App 324, 331-332; 463 NW2d 487 (1990).[17]

"Under MRE 702, it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible." *Edry v Adelman*, 486 Mich 634, 642; 786 NW2d 567 (2010). "[T]he whole point of *Daubert* is that experts can't speculate. They need analytically sound bases for their opinions, and it is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate." *Id*. at 642 n 6 (quotation marks, citations, and brackets omitted).

In analyzing plaintiff's motion to strike the disputed expert-opinion evidence, the Special Master opined that plaintiff was not entitled to a *Daubert* hearing, reasoning (in pertinent part) as follows:

> **4. Gatekeeper Role.**
>
> The "gatekeeper" doctrine envisioned by *Daubert*, *supra*, for analyzing expert testimony was designed to protect juries and is largely irrelevant in the context of a non-jury case like this one. *People v Taylor*, 245 Mich App 293, 305; 628 NW2d 55 (2001). Moreover, in a non-jury case, probing the experts' methodologies under *Daubert*, *supra*, to avoid misleading this Court is not an efficient use of judicial or party resources, because the Court can simply receive the testimony and give it the weight it deserves. *People v Wofford*, 196 Mich App 275, 282; 492 NW2d 747 (1992); *People v Lanzo Constr. Co.*, 272 Mich App 470, 484; 726 NW2d 746 (2006).
>
> Given the flexible nature of MRE 702, and given the fact that the triers of fact in this case are Circuit and Court of Appeals judges, the Court finds that there is little or no risk that the expert testimony in this case will be given undue weight. This Court and the Court of Appeals are presumed capable of weighing evidence to sift the important from the unimportant, and even the admissible from the inadmissible when those are intertwined in a way that might counsel excluding the same evidence from consideration by a lay jury. *Wofford*, 196 Mich App at 282; *Lanzo Constr. Co.*, 272 Mich App at 484. This Court and the Court of Appeals are fully capable of receiving, considering, and giving the appropriate weight to the City's expert reports and its supporting evidence.

However, none of the decisions cited by the Special Master—i.e., *Wofford*, *Lanzo Construction*, and *Taylor*—supports the proposition that the *Daubert* "gatekeeper" duty need only be observed in cases that will be tried before a jury. Instead, the cited cases stand for the proposition that because judges are presumed to know the law, including what evidence is admissible and for what

---

[17] Because *Amorello* was issued after November 1, 1990, and it has never been reversed or modified by our Supreme Court or a special panel of this Court, it is binding under MCR 7.215(J)(1). See *In re Medina*, 317 Mich App 219, 230; 894 NW2d 653 (2016).

particular purposes, evidentiary errors that might ordinarily warrant reversal are generally harmless when they occur in the context of a bench trial. Thus, we respectfully disagree with the Special Master's suggestion that decisions such as *Wofford* might justify disregarding our Supreme Court's admonition in *Craig*, 471 Mich at 82, that a "court *must* evaluate expert testimony under MRE 702 once that issue is raised." See *In re AGD*, 327 Mich App 332, 339-340; 933 NW2d 751 (2019) (noting that, under the doctrine of vertical stare decisis, only our Supreme Court has authority to overrule one of its prior decisions, and until that Court does so, its former decisions remain binding on all lower courts).

Notwithstanding this however, under the circumstances at bar, we decline to refer this matter back to the Special Master for a *Daubert* hearing at this juncture. Put simply, assuming that plaintiff's *Daubert* challenge *is* meritorious—i.e., that the disputed expert opinions are *not* substantively admissible for purposes of summary disposition—that would not impact our holding that defendant is entitled to summary disposition under MCR 2.116(C)(10). This is because plaintiff, not defendant, bears the burden of production here with regard to the few material points of disputed fact. See MRE 301 ("In a civil case, unless a statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption."); *Quinto*, 451 Mich at 362 ("Where the burden of proof at trial on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists."); *Youmans v Charter Twp of Bloomfield*, 336 Mich App 161, 226; 969 NW2d 570 (2021) (observing that "the party challenging a given municipal utility charge under § 31 bears the burden of establishing the unconstitutionality of the charge at issue" and that "the presumption of reasonableness regarding municipal utility rates is a 'pertinent' consideration when considering the second *Bolt* factor") (quotation marks and citations omitted); *Isabella Co Dep't of Social Servs v Thompson*, 210 Mich App 612, 616; 534 NW2d 132 (1995) ("an unrebutted presumption can form the basis for . . . summary disposition"). In other words, even if plaintiff is correct that *defendant's* disputed expert-opinion evidence is all inadmissible, that would not alter our conclusion (explained fully in the next section of this opinion) that defendant is entitled to summary disposition under MCR 2.116(C)(10) based on *plaintiff's* failure to produce sufficient substantively admissible evidence to yield a genuine issue with regard to the material disputed facts in this case.

## D. SUMMARY DISPOSITION UNDER MCR 2.116(C)(10)

Turning to the true heart of the analysis, as this Court explained in *Youmans*, 336 Mich App at 225-226:

> The Headlee Amendment was adopted by referendum effective December 23, 1978. It was proposed as part of a nationwide 'taxpayer revolt' in which taxpayers were attempting to limit legislative expansion of requirements placed on local government, to put a freeze on what they perceived was excessive government spending, and to lower their taxes both at the local and the state level. These purposes would be thwarted if a local authority could charge higher utility rates to raise revenue and then use some of the excess funds to finance a public-works project. As adopted, the Headlee Amendment imposes on state and local government a fairly complex system of revenue and tax limits.

-13-

* * *

. . . Section 31 prohibits units of local government from levying any new tax or increasing any existing tax above authorized rates without the approval of the unit's electorate. Although the levying of a new tax without voter approval violates the Headlee Amendment, a charge that constitutes a user fee does not, and the party challenging a given municipal utility charge under § 31 bears the burden of establishing the unconstitutionality of the charge at issue. [Quotation marks and citations omitted.]

In "determining whether a municipal charge represents a permissible 'user fee' or an impermissible 'tax' under Headlee § 31," this Court generally applies the three-prong test set forth by our Supreme Court in *Bolt*. *Youmans*, 336 Mich App at 226.

> As explained by our Supreme Court, "There is no bright-line test for distinguishing between a valid user fee and a tax that violates the Headlee Amendment." *Bolt*, 459 Mich at 160. In general, "a fee is exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit. A tax, on the other hand, is designed to raise revenue." *Id*. at 161 (cleaned up). Under *Bolt*, courts apply three key criteria when distinguishing between a user fee and a tax: (1) "a user fee must serve a regulatory purpose rather than a revenue-raising purpose"; (2) "user fees must be proportionate to the necessary costs of the service"; and (3) a user fee is voluntary in that users are "able to refuse or limit their use of the commodity or service." *Id*. at 161-162. "These criteria are not to be considered in isolation, but rather in their totality, such that a weakness in one area would not necessarily mandate a finding that the charge is not a fee." *Wheeler v Shelby Charter Twp*, 265 Mich App 657, 665, 697 NW2d 180 (2005) (cleaned up). [*Shaw v City of Dearborn*, 329 Mich App 640, 653; 944 NW2d 153 (2019).]

In her report, the Special Master recommended that we hold that the first prong of the instant inquiry favors defendant's position—i.e., that the disputed charges primarily serve a valid regulatory purpose, rather than a revenue-raising purpose. Among other things, the Special Master focused on the fact that the disputed storm-sewer system is subject to mandatory federal regulations under the National Pollutant Discharge Elimination System (NPDES). The Special Master also opined that, as a matter of law, she was required to focus on whether the rates as a whole primarily served a valid regulatory purpose and should not "engage in second-guessing and piecemeal evaluation of individual costs for segregated aspects of the system that constitute just a small portion of the overall uses of revenue generated from the fees."

Based on the undisputed facts at issue in this case, we tend to agree with the Special Master's overarching reasoning concerning the first *Bolt* factor. As this Court recently noted in *Mackinaw Area Tourist Bureau, Inc v Village of Mackinaw City*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 361625), slip op at 15:

> Generally speaking, "it is beyond dispute" that water and sewer rates serve the regulatory purpose of providing water and sewer services to ratepayers. *Shaw*,

-14-

329 Mich App at 666. Such rates "fund the operational and capital expenses" of the water and sewer systems, which likewise "serves the primary function of providing water and sewer services" to ratepayers. *Youmans*, 336 Mich App at 228.

In addition, "[c]ategorically, obligations arising out of administrative-agency regulations serve a regulatory purpose." *Youmans*, 336 Mich App at 228-229. And as the Special Master correctly noted, the proper focus of the instant inquiry is on the primary purpose served by the rates "as a whole[.]" See *id*. at 229 ("viewing the disputed rates as a whole, we are persuaded that they primarily serve valid regulatory purposes under the first *Bolt* factor, which favors the determination that they are user fees rather than taxes"). See also *Merrelli v St Clair Shores*, 355 Mich 575, 583; 96 NW2d 144 (1959) ("[W]e have considered 2 sources of municipal funds, differing in governmental theory, each having inherent limitations resulting therefrom. One involves an exercise of the municipal power of taxation. Its purpose is to raise money. The other is an exercise of the police power of the community. Its purpose is the protection of the public health, safety, and welfare. True, certain moneys may be obtained in connection therewith, but such moneys are incidental to the accomplishment of the *primary* purpose of guarding the public.") (emphasis added).

Storm-sewer systems like the one at issue here are subject to significant federal regulation and oversight. In 1972 amendments to the Clean Water Act, 33 USC 1281 *et seq*., Congress established the NPDES, "a federal permit program designed to regulate the discharge of polluting effluents" into navigable waterways. *Int'l Paper Co v Ouellette*, 479 US 481, 489; 107 S Ct 805; 93 L Ed 2d 883 (1987). "Storm sewers are established point sources subject to NPDES permitting requirements," *Environmental Defense Ctr, Inc v US EPA*, 344 F3d 832, 841 (CA 9, 2003), and it is undisputed that, as the operator of "a 'municipal separate storm sewer system' (MS4)" serving "a population of at least 100,000," defendant City is required to hold a NPDES permit "before discharging storm water into navigable waters," see *Los Angeles Co Flood Control Dist v Natural Resource Defense Council, Inc*, 568 US 78, 80-81; 133 S Ct 710; 184 L Ed 2d 547 (2013).[18] Indeed, § 301(a) of the Clean Water Act, 33 USC 1311(a), "generally prohibits the discharge of *any* effluent into a navigable body of water unless the point source has obtained a NPDES permit from the Environmental Protection Agency (EPA)." *Int'l Paper*, 479 US at 489 (emphasis added).

Through the Department of Environment, Great Lakes, and Energy (EGLE), "Michigan administers the NPDES within this state pursuant to the Clean Water Act and" the Natural

---

[18] See also Mich Admin Code R 323.2103(o) (" 'Municipal separate storm sewer system' or 'MS4' means all separate storm sewers that are owned or operated by the United States, a state, city, village, township, county, district, association, or other public body created by or pursuant to state law, having jurisdiction over disposal of sewage, industrial wastes, storm water, or other wastes, including special districts under state law, such as a sewer district, flood control district, or drainage district, or similar entity, or a designated or approved management agency under section 208 of the federal act that discharges to waters of the state. This term includes systems similar to separate storm sewer systems in municipalities, such as systems at military bases, large hospital or prison complexes, and highways and other thoroughfares. The term does not include separate storm sewers in very discrete areas, such as individual buildings.").

Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq*. *Mich Farm Bureau v Dep't of Environment, Great Lakes, & Energy*, 343 Mich App 293, 297; 997 NW2d 467 (2022), vacated in part on other grounds ___ Mich ___ (2024) (Supreme Court Docket No. 165166). Nevertheless, under 33 USC 1342(d), the EPA retains authority to block this state's proposed issuance of any particular NPDES permit. See *Int'l Paper*, 479 US at 489.

Violation of NPDES requirements can carry both criminal and civil penalties. See 33 USC 1319(c) and (d); *Maui Co, Hawaii v Hawaii Wildlife Fund*, 590 US 165, 186; 140 S Ct 1462; 206 L Ed 2d 640 (2020) (observing that, under the NPDES "penalty provision," federal courts are granted "broad discretion to set a penalty that takes account of many factors"). And the ultimate responsibility for complying with such federal requirements cannot be avoided via state laws that prevent a municipality from raising the requisite revenue. See 33 USC 1319(e) ("Whenever a municipality is a party to a civil action brought by the United States under this section, the State in which such municipality is located shall be joined as a party. *Such State shall be liable for payment* of any judgment, or any expenses incurred as a result of complying with any judgment, entered against the municipality in such action *to the extent that the laws of that State prevent the municipality from raising revenues needed to comply with such judgment*.") (emphasis added); *United States v Metro St Louis Sewer Dist*, 952 F2d 1040, 1043 (CA 8, 1992) ("Because this section [i.e., 33 USC 1319(e)] declares that the State may be liable for a judgment reached against a municipality, the normal course of action is for the United States to name the State as a defendant.").

It is true that, in *Bolt*, the parties raised somewhat similar regulatory concerns; to wit, they raised concerns regarding the possibility that Lansing *might*, under EPA guidelines that were merely "proposed" at that time, become subject to NPDES permitting requirements after implementing a separate sewer system, and thus face the *possibility* of incurring federal penalties and enforcement actions for failure to comply. See *Bolt*, 459 Mich at 155 (noting that the planned separation of Lansing's sanitary- and storm-sewer system in that case was an effort to *proactively* comply with the Clean Water Act and NPDES requirements); *id*. at 166 ("[T]he acknowledged goal of the ordinance is to address environmental concerns regarding water quality. Improved water quality in the Grand and Red Cedar Rivers *and the avoidance of federal penalties for discharge violations* are goals that benefit everyone in the city, not only property owners.") (emphasis added); *id*. at 170-171 & n 2 (BOYLE, J., dissenting) ("Although unclear, the parties state that, under proposed EPA guidelines, once the city of Lansing implements the separated storm water/sewer system, it will result in a storm water system that serves more than 100,000 people and the city must request and obtain a specific storm water permit").

In that respect, however, the situation in *Bolt* is both legally and factually distinguishable from the instant case. Unlike *Bolt*, here the disputed charges are not being used to raise capital funds to *create* a separated sewer system; rather, defendant City's separated storm-sewer system is already built and paid for, and the disputed charges are being used to fund its continued operation, both in the form of current operating costs and capital expenses for maintenance and improvement. Moreover, unlike *Bolt*, here the concerns regarding the effect of NPDES-MS4 requirements on the municipality are not inchoate fears regarding the impact that *potential* federal regulation and enforcement *might* have on a not-yet-completed sewer system; rather, they seek to address the comprehensive federal regulatory scheme that does, in fact, apply to the storm-sewer system at issue here. See *Los Angeles Co Flood Control Dist*, 568 US at 80-81 ("Petitioner . . .

operates a 'municipal separate storm sewer system' (MS4)—a drainage system that collects, transports, and discharges storm water. See 40 CFR § 122.26(b)(8) (2012). See also § 122.26(b)(13) ('Storm water means storm water runoff, snow melt runoff, and surface runoff and drainage.'). Because storm water is often heavily polluted, see 64 Fed.Reg. 68724–68727 (1999), the CWA and its implementing regulations require the operator of an MS4 serving a population of at least 100,000 to obtain a [NPDES] permit before discharging storm water into navigable waters.").[19]

Given that the disputed charges in this case are utilized to comply with mandatory federal regulations, deeming them to be unlawful taxes under Headlee § 31 would, ultimately at least, likely lead to the circular result of the same charges being lawfully assessed as property taxes— again *without* voter approval—by operation of a judgment against defendant City obtained by the EPA or EGLE, or possibly a consent judgment agreed to by those entities. See generally 33 USC 1319(b) (granting the EPA Administrator the power "to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order under subsection (a)," including violations of NPDES-permit requirements); *American Axle & Mfg, Inc v City of Hamtramck*, 461 Mich 352; 604 NW2d 330 (2000) (holding that judgment levies added to the tax rolls pursuant to MCL 600.6093 are not subject to Headlee voter-approval requirements because the imposition of such levies was already authorized by law at the time the Headlee amendment was ratified). Indeed, because "a court may not hold a civil defendant liable under state law for conduct federal law requires," *Armstrong v Exceptional Child Ctr, Inc*, 575 US 320, 326; 135 S Ct 1378; 191 L Ed 2d 471 (2015), we have serious doubts whether it would be appropriate for us to issue the kind of injunction requested by plaintiff here—i.e., one "[p]ermanently enjoin[ing] the City from imposing or collecting any Stormwater Charges, unless those Charges receive voter approval in conformance with the Headlee Amendment[.]"

In any event, given that the charges at issue are primarily used to fund the operational and capital expenses of defendant City's federally mandated storm-sewer system, we conclude that those charges primarily serve valid regulatory purposes, which militates in favor of holding that they are valid user fees. See *Mackinaw Area Tourist Bureau*, ___ Mich App at ___, slip op at 15; accord *Shaw*, 329 Mich App 666 ("Under the first *Bolt* factor, it is beyond dispute that the city's water and sewer rates comprise a valid user fee because the rates serve the regulatory purpose of providing water and sewer service to the city's residents. Although the rates generate funds to pay for the operation and maintenance of the water and sewer systems in their entirety, this by itself does not establish that the rates serve primarily a revenue-generating purpose."); *Youmans*, 336 Mich App at 228-229 ("Categorically, obligations arising out of administrative-agency regulations serve a regulatory purpose.

---

[19] With certain limited exceptions, "[i]t is axiomatic that federal law controls the interpretation of federal statutes and regulations," *Brown v United States*, 890 F2d 1329, 1341 (CA 5, 1989), and "[w]ith regard to issues involving federal law, this Court is bound by decisions of the United States Supreme Court, but is not bound by decisions of any lower federal courts," *Bienenstock & Assoc, Inc v Lowry*, 314 Mich App 508, 515; 887 NW2d 237 (2016).

In analyzing the second prong of the *Bolt* test, the Special Master stated "findings" supporting an affirmative conclusion that the disputed charges *are* reasonably proportionate to the actual costs of providing the associated storm-sewer services. On the record presented here, however, we neither can nor do reach any such definitive holding on that factual question. Instead, we hold that plaintiff has failed to carry its burden of producing sufficient substantively admissible evidence to rebut the applicable presumption of proportionality or yield a genuine issue of material fact whether the disputed rates are reasonably proportionate to the associated costs.

"Where the charge for . . . storm . . . sewers reflects the actual costs of use, metered with relative precision in accordance with available technology, including some capital investment component, sewerage may properly be viewed as a utility service for which usage-based charges are permissible, and not as a disguised tax." *Bolt*, 459 Mich at 164-165 (quotation marks and citation omitted). In other words, the "[f]ees charged by a municipality must be *reasonably* proportionate to the *direct and indirect* costs of providing the service for which the fee is charged." *Jackson Co v City of Jackson*, 302 Mich App 90, 109; 836 NW2d 903 (2013) (quotation marks and citation omitted; emphasis added). "[M]athematic precision is not necessary in calculating the fee," and "[t]his Court must presume the amount of the fee to be reasonable, unless the contrary appears upon the face of the law itself, or is established by proper evidence." *Id*. (quotation marks and citation omitted). Accord *Kircher v City of Ypsilanti*, 269 Mich App 224, 231-232; 712 NW2d 738 (2005), citing *Merrelli*, 355 Mich at 588 ("The law does not demand a precise correlation between costs and fees required, but, rather, a reasonable relation.").

As the party raising this challenge under Headlee § 31, plaintiff bears "the burden of establishing the unconstitutionality of the city's storm water management charge." See *id*. at 98. Plaintiff also bears the burden of overcoming two distinct presumptions that apply in cases like these: (1) the presumption of constitutionality, see *Taxpayers United for Mich Constitution, Inc v City of Detroit*, 196 Mich App 463, 466-467; 493 NW2d 463 (1992); and (2) the presumption that the rates are "reasonable"—i.e., that they "reasonably reflect the actual cost of service," see *Youmans*, 336 Mich App at 216-217, 226-227 (quotation marks and citation omitted); accord *Mackinaw Area Tourist Bureau*, ___ Mich App at ___, slip op at 17 ("Plaintiffs bore the burden of establishing that the Village's water and sewer rates were not proportionate to the necessary cost of providing those services, which included overcoming the presumption that the Village's utility rates were reasonable.").

Given that plaintiff carries those burdens, to survive defendant's motion for summary disposition under MCR 2.116(C)(10), plaintiff was required to produce sufficient substantively admissible to yield a genuine issue of material fact with regard to all three prongs of the *Bolt* inquiry, including the proportionality prong. See *Quinto*, 451 Mich at 362 ("Where the burden of proof at trial on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists."). And somewhat overlappingly, plaintiff was also required to produce sufficient evidence to rebut the presumptions of constitutionality and reasonableness. See MRE 301 ("In a civil case, unless a statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption."); *Isabella Co Dep't of Social Servs*, 210 Mich App at 616 ("an unrebutted presumption can form the basis for . . . summary disposition").

In this instance, plaintiff failed to carry its burden of production in those regards, at least with regard to the instant proportionality inquiry. From the outset of this action, plaintiff has maintained that the unconstitutionality of the disputed storm-sewer charges is, in essence, self-evident, repeatedly indicating that there was no need for discovery or the development of a factual record to support the Headlee claims in this case. For example, in the caption of its complaint, plaintiff included the following statement:

> PURSUANT TO MCR 7.206(E) AND MCR 2.112(M), PLAINTIFF STATES THAT IT DOES NOT BELIEVE THERE ARE ANY FACTUAL QUESTIONS THAT ARE ANTICIPATED TO REQUIRE RESOLUTION BY THE COURT AND PLAINTIFF DOES NOT ANTICIPATE THE NEED FOR DISCOVERY AND THE DEVELOPMENT OF A FACTUAL RECORD.

Even so, after reviewing the parties' initial filings, we reached the opposite conclusion, referring this matter for further proceedings before a Special Master—including discovery. Nevertheless, in the ensuing proceedings before the Special Master, plaintiff continued to argue that the development of any further factual record was largely unnecessary, agreeing to have the matter resolved on motions for summary disposition. Again, by way of example, at a hearing on the parties' respective motions for summary disposition, when the Special Master asked what witnesses plaintiff might call at trial in the event that summary disposition was denied to both sides, plaintiff's counsel replied:

> We would have our class representative talk about paying the charges. But in these types of cases, virtually all of the evidence is going to come from documents authored by the city or by testimony of the city's own witnesses that we would conduct as adverse witnesses.
>
> So as reflected in the Summary Disposition briefing, all of our evidence, virtually all of our evidence of our evidence of the material facts are based upon admissions that have been made by the city. A lot of them pre-lawsuit admissions about the nature of their storm system and the nature of these charges. And supplemented with deposition testimony that we obtained during the discovery phase of the case.
>
> So both sides are here because both sides don't think that there are material facts in dispute.

Plaintiff's counsel also suggested that defendant City bore the burden of producing evidence to establish that the facts of this case were materially distinguishable from those at issue in *Jackson County*, arguing as follows:

> From our perspective, you're to be guided -- the good thing for the court is, there's a binding public decision on the Court of Appeals, the Jackson case; 30, 40 miles down the road, involving their storm system that is, in our view, indistinguishable from Ann Arbor's.
>
> So the crux of the facts here are, what facts were important in the Jackson case, to a certain extent the Bolt case, and are those same facts present here; or are

the facts different enough, *and this is the city's task*, to say well, our facts are different, judge, and if you find these facts, it leads intellectively to a different decision than the Jackson case. [Emphasis added.]

In our estimation, that approach to the evidentiary record and the burdens of proof and production in this case led to a fatal flaw in plaintiff's arguments concerning summary disposition under MCR 2.116(C)(10). As noted, plaintiff raises a *Daubert* challenge to the admissibility of certain opinion evidence offered by defendant's proposed expert witnesses, including certain opinions regarding the proportionality of the disputed charges to the actual costs of their provision. But plaintiff fails to recognize that it—not defendant—bears the burden of producing sufficient substantively admissible evidence to yield a genuine issue of material fact with regard to the proportionality of the disputed charges, and also to rebut the presumption of reasonableness.

Much of plaintiff's argument is centered on what it portrays as factual similarities between this case and *Jackson County*. Plaintiff is correct that, at first blush, the storm-sewer charges and systems at issue in the two cases appear to be quite similar in several respects. But plaintiff fails to recognize one decidedly material distinction between this case and *Jackson County*. In the consolidated original actions that were at issue in *Jackson County*, one of the plaintiffs presented a report from its retained expert witness, Patrick L. Anderson, "a professional economist and Principal in the consulting firm of Anderson Economic Group, LLC[.]"[20] In that report, Anderson opined, among other things, that based on his review of the available data, it was "clear that the actual use of the 'fee' revenues collected [we]re wholly out of proportion to any actual costs of providing a service to individual property owners," even after considering the "excess revenue" that was apparently being saved as "working capital" for future expenses.

In contrast, here plaintiff has presented no expert-opinion evidence to support its allegations that, after due consideration of existing capital reserves, anticipated future capital expenses, and both the direct and indirect expenses associated with the storm-sewer system, the disputed charges are disproportionate to the direct and indirect costs of providing the storm-sewer services. On the contrary, plaintiff effectively begs the question. In plaintiff's motion for summary disposition and response to defendant City's opposing motion, in support of its arguments that the disputed charges are disproportionate to the underlying costs, plaintiff cites various "financial statements" issued by defendant City, arguing that those statements demonstrate that, during the relevant timeframe, the City was annually reaping "a handsome profit" of millions of dollars in excess of its actual "Stormwater-related operating expenses."

Plaintiff's mere citation of such evidence was insufficient to yield a genuine issue of material fact regarding the instant proportionality inquiry. To reiterate: "Trial courts are not the research assistants of the litigants; the parties have a duty to fully present their legal arguments to the court for its resolution of their dispute." *Walters*, 481 Mich at 388. We are jurists, not accountants. Nor are we experts in utility ratemaking, which is a complex, forward-looking

---

[20] Although the Anderson Report is not mentioned *overtly* in this Court's opinion in the *Jackson County* cases, we take judicial notice of that report, given that it appears in this Court's files. See *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009) ("a court may take judicial notice of its own files and records").

-20-

process, involving significant guesswork and attempts to forecast future expenses that are subject to fluctuation. See *City of Novi v City of Detroit*, 433 Mich 414, 429, 432; 446 NW2d 118 (1989) ("any given formula will employ approximations of the factors used to arrive at an approximation of the actual cost of service"); *Youmans*, 336 Mich App at 172-173 (summarizing expert testimony concerning the utility-ratemaking process generally employed by municipalities). As our Supreme Court observed in *City of Novi*, 433 Mich at 430: "Courts of law are ill-equipped to deal with the complex, technical processes required to evaluate the various cost factors and various methods of weighing those factors required in rate-making." Nevertheless, plaintiff effectively asks this Court to independently review the cited financial documents—without the aid of any expert assistance— and make unilateral findings regarding proportionality. But "without a comprehensive rate study—or some similar evidence demonstrating that the disputed rates excessively compensated the [municipality] for the related utility services—one can at best speculate about whether the disputed rates were proportional to the underlying costs." See *Youmans*, 336 Mich App at 220. And although "[c]ircumstantial evidence can be sufficient to establish a genuine issue of material fact, . . . mere conjecture or speculation is insufficient." *McNeill-Marks*, 316 Mich App at 16.

In short, as a result of plaintiff's failure to carry its burden of producing sufficient substantively admissible evidence to rebut the relevant presumptions or to allow a rational trier of fact to find that the disputed charges are, in fact, disproportionate to the underlying costs, we conclude that the second *Bolt* factor necessarily favors defendant City here. See *Youmans*, 336 Mich App at 231 ("Because plaintiff did not carry her burden of demonstrating disproportionality, it necessarily follows that the second *Bolt* factor militates in favor of the Township's position."); see also *Maiden*, 461 Mich at 121 (holding that, in the context of a (C)(10) motion, "[a] reviewing court may not employ a standard citing the mere possibility that the claim might be supported by evidence produced at trial").

In analyzing the final *Bolt* prong, the Special Master stated "findings" suggesting that the disputed storm-sewer charges are "voluntary," rather than compulsory. We respectfully disagree.

As this Court explained in *Youmans*, 336 Mich App at 231-232:

> The instant case is distinguishable from *Shaw* with respect to the third *Bolt* factor. In this case, the parties agree that the disputed water and sewer rates each comprised both a variable rate, which was based on metered water usage, and a fixed rate. . . . Contrastingly, in *Shaw*, it was "uncontested that Dearborn determine[d] its water and sewer rates based on metered-water usage" alone. *Id*. at 667-668; see also *id*. at 668 (distinguishing *Bolt* on the basis that the disputed rates in *Bolt* were "flat rates," not variable rates based on "metered-water usage").

> On this record, we conclude that use of the Township's water and sewer services cannot be viewed as "voluntary" for purposes of the *Bolt* inquiry. If a charge is "effectively compulsory," it is not voluntary. *Bolt*, 459 Mich at 167. With the exception of those sewer-only customers who have elected not to have a meter installed to track their actual well-water usage, it is technically true that the Township's water and sewer customers can avoid paying the variable portion of the disputed rates by refusing to use any water. But the fixed portions of those rates constitute flat-rate charges like those in *Bolt*, 459 Mich at 156 n 6, and such flat

-21-

rates can only be avoided by not being a utility customer in the first instance. To the extent that the Township contends that the fixed rates are nevertheless voluntary because ratepayers can avoid paying them by moving elsewhere, that argument is unavailing. See *id*. at 168 ("The dissent suggests that property owners can control the amount of the fee they pay by building less on their property. However, we do not find that this is a legitimate method for controlling the amount of the fee because it is tantamount to requiring property owners to relinquish their rights of ownership to their property by declining to build on the property."). In light of *Bolt*, 459 Mich at 167-168, we conclude that at least the fixed portion of the disputed rates here— the most sizable portion—is effectively compulsory. Thus, the third *Bolt* factor weighs in favor of plaintiff's position.

Based on the undisputed facts in this case, the contested storm-sewer charges are "effectively compulsory," rather than voluntary. The parties agree that the charges in question are assessed based on the total square footage of "impervious" surfaces present on a given parcel. Thus, a landowner could technically avoid the charges by leaving his or her property undeveloped or removing any existing impervious surfaces. But as recognized in cases like *Bolt* and *Youmans*, that does not render the charges "voluntary" because it effectively forces property owners to choose between paying the disputed charges or relinquishing their rights of ownership and their ability to develop and maintain their properties as they wish. See *Youmans*, 336 Mich App at 231-232. Also, to the extent that defendant argues that the disputed charges should be deemed "voluntary" because ratepayers can receive credits by taking certain steps to reduce the amount of stormwater runoff on their properties, that argument is also directly contravened by binding precedent. See *Jackson County*, 302 Mich App at 111-112 ("[T]his system of credits effectively mandates that property owners pay the charge assessed or spend their own funds on improvements to their respective properties, as specified by the ordinance and the city, in order to receive the benefit of any credits. In other words, property owners have no means by which to escape the financial demands of the ordinance.").[21] Hence, we conclude that the charges at issue here are effectively compulsory, which militates in favor of deeming them to be an improper tax under Headlee § 31.

III. CONCLUSION

In sum, for the reasons set forth above, we conclude that the first two *Bolt* factors favor the conclusion that the disputed charges are valid user fees, rather than unlawful taxes, while the third factor favors the opposite conclusion. Even so, on balance, we conclude that defendant City is entitled to judgment as a matter of law based on binding precedent. See *Youmans*, 336 Mich App at 232-233 ("On balance, plaintiff failed to carry her burden of demonstrating that the disputed

---

[21] We are cognizant that, if physically capable of doing so and already in possession of the required tools and know-how, some ratepayers might technically be able to receive some of the available credits without any expenditure of cash (e.g., by expending their own time and labor to dig a dry well or to plant a rain garden using cloneable or seed-bearing plants already extant on the property). But in light of "the ancient maxim that time is money," *Oviedo v Ozierey*, 104 Mich App 428, 432; 304 NW2d 596 (1981), we view this as a distinction without a difference.

rates are impermissible taxes, rather than user fees, for purposes of Headlee § 31. The first and second *Bolt* factors clearly favor the conclusion that the disputed charges are proper user fees, and with regard to the third factor, 'the lack of volition does not render a charge a tax, particularly where the other criteria indicate the challenged charge is a user fee and not a tax.' "), quoting *Wheeler*, 265 Mich App at 666. Accord *Westlake Transp, Inc v Pub Serv Comm*, 255 Mich App 589, 616; 662 NW2d 784 (2003) ("Even if we were to view the exaction as more compulsory than voluntary, when the totality of factors are considered, we believe the exactions are most properly classified as regulatory fees.").

Accordingly, we grant defendant City summary disposition pursuant to MCR 2.116(C)(10). This opinion constitutes our final judgment in this action. See MCR 7.215(E)(1). Given the questions of significant public interest involved, no taxable costs are awarded. See MCR 7.219(A).

/s/ Michael J. Kelly
/s/ Jane E. Markey
/s/ James Robert Redford